FILED
United States Court of Appeals
Tenth Circuit

November 24, 2021

Christopher M. Wolpert
Clerk of Court

<u>PUBLISH</u>

## UNITED STATES COURT OF APPEALS

### TENT CIRCUIT

---

RHONDA BREWER; DAVID MCCOY;
MARY O'GRADY; MARISSA ELYSE
SANCHEZ,

     Plaintiffs - Appellees,

and

JOHN MARTIN,

     Plaintiff

v.

CITY OF ALBUQUERQUE,

     Defendant - Appellant.

No. 19-2140

---

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:18-CV-00031-RB-JFR)**

---

Jaime A. Santos, Goodwin Procter LLP, Washington, D.C. (María Martínez
Sánchez and Leon Howard, ACLU of New Mexico, Albuquerque, New Mexico;
Kevin P. Martin, Gerard J. Cedrone, Martin C. Topol, Christopher J.C. Herbert,
Goodwin Procter LLP, Boston, Massachusetts, with her on the briefs), for
Plaintiffs-Appellees.

Timothy J. Atler, Atler Law Firm, P.C., Albuquerque, New Mexico (Jazmine J.
Johnston, Atler Law Firm, P.C., Albuquerque, New Mexico and Esteban A.
Aguilar, Jr., City Attorney, City of Albuquerque, Albuquerque, New Mexico, with
him on the briefs), for Defendant-Appellant.

Before **HOLMES**, **BACHARACH**, and **MORITZ**, Circuit Judges.

**HOLMES**, Circuit Judge.

When the government restricts the time, place, or manner of expressive activities in "traditional public for[a]," like streets and sidewalks, it must show that such restrictions are "narrowly tailored to serve . . . substantial and content-neutral government interests." *Ward v. Rock Against Racism*, 491 U.S. 781, 803 (1989). In this case, we consider—for the third time in as many years—whether a city has fulfilled its narrow tailoring obligation with regard to such a restriction. *See Evans v. Sandy City*, 944 F.3d 847, 852 (10th Cir. 2019) (concluding that Sandy City, Utah's ordinance prohibiting pedestrians from occupying unpaved or narrow medians was narrowly tailored and constituted a "valid time, place, or manner restriction on speech" under the First Amendment), *cert. denied*, 141 S. Ct. 235 (2020); *McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1080 (10th Cir. 2020) (concluding that Oklahoma City, Oklahoma's ordinance prohibiting pedestrian presence on medians was not narrowly tailored and, accordingly, ran afoul of the First Amendment), *cert. denied*, 141 S. Ct. 1738 (2021).

The City of Albuquerque, New Mexico ("Albuquerque" or "the City") enacted a city-wide ordinance (hereinafter, "the Ordinance") that, in pertinent part, prohibits pedestrians from (1) congregating within six feet of a highway

2

entrance or exit ramp, (2) occupying any median deemed unsuitable for pedestrian use, and (3) engaging in any kind of exchange with occupants of a vehicle in a travel lane.

Plaintiffs-Appellees—residents of Albuquerque who engage in a variety of expressive activities, like panhandling, protesting, or passing out items to the needy—sued the City in federal court, alleging that the Ordinance impermissibly burdens the exercise of their First Amendment rights. The City argued the Ordinance was necessary to address persistent and troubling pedestrian safety concerns stemming from high rates of vehicular accidents throughout Albuquerque—and, in relation to this pressing interest, the Ordinance was narrowly tailored and did not burden substantially more speech than necessary.

The district court disagreed, finding that those provisions of the Ordinance described above violated Plaintiffs' First Amendment rights because they were not narrowly tailored to the City's interest in increasing pedestrian safety and, more specifically, reducing pedestrian-vehicle conflicts (e.g., collisions). On appeal, the City asserts the district court erred in concluding the Ordinance did not pass First Amendment muster, and it specifically focuses on the question of narrow tailoring, arguing that the City did, indeed, appropriately tailor the Ordinance—and, in any event, it was required to do no more than it did.

We reject the City's position and, for the reasons explained *infra*, hold that the Ordinance is not narrowly tailored and, therefore, violates the First

Amendment.  Accordingly, exercising jurisdiction under 28 U.S.C. § 1291, we **affirm** the judgment of the district court.

# I

## A

This appeal concerns Albuquerque Code of Ordinances § 8-2-7-2, which regulates pedestrian presence in and around roadways throughout Albuquerque. Originally adopted by Albuquerque's city council in November 2017 in Council Bill No. O-17-51, the Ordinance amended portions of the City's Traffic Code "relating to pedestrian safety and vehicle/pedestrian conflicts."  Aplt.'s App., Vol. I, at 81 (Council Bill No. O-17-51, dated Nov. 6, 2017) (capitalization omitted).[1]

The Ordinance contains six subsections—four of which are at issue in this appeal—that, together, prohibit pedestrians from "occupying roadways, certain medians[,] and roadside areas" and proscribe "certain pedestrian interactions with vehicles."  Albuquerque, N.M., Code of Ordinances § 8-2-7-2 (capitalization omitted).  Subsection (B)[2] of the Ordinance prohibits "any person" from

---

[1]    The Council later amended the Ordinance through Council Bill F/S O-19-66, which "ma[de] certain non-substantive clarifications" to the Ordinance's text.  Aplt.'s App., Vol. VI, at 1462 (Council Bill No. F/S O-19-66, enacted July 10, 2019).  References to the Ordinance throughout this opinion are to the Ordinance as modified by Council Bill No. F/S O-19-66—in other words, the Ordinance as currently codified in § 8-2-7-2.  Furthermore, when we refer to the Ordinance in Section III, *infra*, we *only* refer to those subsections at issue in this appeal, i.e., subsections (B), (C), (D), and (E), unless stated otherwise.

[2]    Subsection (A) makes it "unlawful for any person to stand in any
                                                            (continued...)

"access[ing], us[ing], occupy[ing], congregat[ing,] or assembl[ing] within six feet

of a travel lane of an entrance or exit ramp to Interstate 25, Interstate 40, or to

Paseo del Norte at Coors Boulevard NW, Second Street NW, Jefferson Street NW,

or Interstate 25, except on a grade separated sidewalk or designated pedestrian

way," and "unless reasonably necessary because of an emergency situation where

such area provides the only opportunity for refuge from vehicle traffic or other

safety hazard." *Id.* § 8-2-7-2(B).[3]  The Code of Ordinances defines "travel lane"

as "[t]he portion of the roadway dedicated to the movement of motor vehicles

traveling from one destination to another where a motor vehicle may not remain

---

[2](...continued)
travel lane of a street, highway, or controlled access roadway or in any travel lane
of the exit or entrance ramps thereto." Albuquerque, N.M., Code of Ordinances §
8-2-7-2(A).  The district court concluded that subsection (A) is a reasonable,
content-neutral, and "valid restriction on speech in a *nonpublic forum*." *Martin v.
City of Albuquerque*, 396 F. Supp. 3d 1008, 1023 (D.N.M. 2019) (emphasis
added).  Plaintiffs do not challenge this conclusion on appeal. *See* Aplees.' Resp.
Br. at 8.  Therefore, we deem any such challenge to be "waived (i.e.,
abandoned)." *United States v. Yelloweagle*, 643 F.3d 1275, 1280 (10th Cir.
2011), *cert denied*, 556 U.S. 964 (2012); *accord Tran v. Trs. of State Colleges*,
355 F.3d 1263, 1266 (10th Cir. 2004).

[3]        The City concedes subsection (B) "covers *all* controlled-access
roadways in Albuquerque," such that "there are no exit or entrance ramps in
Albuquerque to which [the subsection] does not apply." Aplees.' Resp. Br. at 8;
*see* Aplt.'s Opening Br. at 49 (insisting that the City "did not select certain
controlled access roadways to be included in the Ordinance," but rather "included
all three of them"); Aplt.'s App., Vol. VI, at 1448 (Suppl. Br. Regarding Recent
Amendments to the Pedestrian Safety Ordinance, filed July 2, 2019) (noting that
Council Bill No. F/S O-19-66 merely clarified the scope of the Ordinance in its
original form—and that, as it relates to subsection (B), the Council Bill merely
"identifie[d] by name the specific highways and controlled access roadways that
[were] referenced in [subsection (B) as originally written]").

stationary indefinitely without eventually obstructing the free flow of traffic, and

not including shoulders, bicycle lanes, or on-street parking." *Id.* § 8-1-1-2.[4]

Subsection (C) regulates pedestrian presence on medians,[5] specifically

making it:

> unlawful for any person to access, use, occupy, congregate, or
> assemble within any median not suitable for pedestrian use,
> unless reasonably necessary during an otherwise lawful street
> crossing at an intersection or designated pedestrian crossing, or
> because of an emergency situation where the median provides the
> only opportunity for refuge from vehicle traffic or other safety
> hazard.

*Id.* § 8-2-7-2(C).

The subsection articulates three categories of medians "not suitable for

pedestrian use":

> (1)  Any portion of a median that is less than six feet in width,
> and located within a roadway with a posted speed limit of 30
> miles per hour or faster or located within 25 feet of an
> intersection with such a roadway; or
>
> (2)  Is the landscaped area of the median as defined by this
> Traffic Code; or
>
> (3)  Is otherwise identified by signage as not suitable for
> pedestrian use by the City Traffic Engineer based on identifiable

---

[4]    The Code further defines "roadway" as the "portion of a street or highway improved, designed, or ordinarily used for vehicular travel, exclusive of the berm or shoulder." Albuquerque, N.M., Code of Ordinances § 8-1-1-2.

[5]    "Median" is defined as the "area of raised land that separates opposing lanes of traffic on divided roadways." Albuquerque, N.M., Code of Ordinances § 8-1-1-2.

safety standards, including but not limited to an unsuitable gradient or other objectively unsuitable features.

*Id.* § 8-2-7-2(C)(1)–(3).[6]

Lastly, subsections (D) and (E) regulate interactions between pedestrians and vehicle occupants. Specifically, subsection (D) makes it "unlawful for any pedestrian to engage in any physical interaction or exchange with the driver or occupants of any vehicle within a travel lane unless reasonably required because of an emergency situation." *Id.* § 8-2-7-2(D). Subsection (E) effectively proscribes the mirror image of the physical interaction or exchange addressed by subsection (D): that is, it prohibits "occupant[s] of a motor vehicle within any travel lane or intersection [from] engag[ing] in any physical interaction or exchange with a pedestrian unless reasonably required because of an emergency situation." *Id.* § 8-2-7-2(E). For both subsections, "physical interaction or exchange" is defined as "conduct by which a pedestrian intentionally makes

---

[6]    The Code defines "landscaped area" as the "area located within a public way where natural ground covers such as decorative gravel, wood chips or boulders, and living vegetative materials such as trees, grasses, vines, shrubs or flowers have been installed"; it does *not* include "concrete, brick or other equivalent hard surface." Albuquerque, N.M., Code of Ordinances § 8-1-1-2. "Public way" is defined as "[t]he entire width between the property lines of every way publicly maintained (including easements maintained for public use) when any part thereof is open to the use of the public for purposes of vehicular or pedestrian travel, notwithstanding that same may be temporarily closed for the purpose of construction, reconstruction, maintenance, alteration or repair." *Id.*; *see also id.* (giving the terms "Highway" and "Street" the same definition).

physical contact with a vehicle in a travel lane or with any of its occupants," or vice versa, "either directly or with an object."[7]  *Id.* § 8-2-7-2(D)–(E).

Violations of the Ordinance are petty criminal misdemeanors punishable "by a fine of not more than $500 or by imprisonment for not more than 90 days or by both such fine and imprisonment."  *Id.* § 8-1-3-99(A).

**B**

Shortly after the Ordinance's passage, several residents of Albuquerque ("Plaintiffs") filed suit in federal district court, alleging that the Ordinance was "overly broad and unconstitutionally infringe[d]" on their "rights to exercise freedom of speech and expression in traditional public forums by restricting a substantial volume of constitutionally protected speech without adequate justification."  Aplt.'s App., Vol. I, at 35 (Compl., filed Jan. 11, 2018).  Plaintiffs "regularly solicit charitable donations from vehicle occupants, provide charitable donations from their vehicles to those solicitors, or engage in political speech,

---

[7]    Subsection (F), the final subsection of the Ordinance, is not at issue in this appeal.  It states that nothing in the Ordinance:

> shall be construed as preventing maintenance or construction activities within medians or roadside areas by public agencies or agents thereof, entering or exiting a bus or other form of public transit at authorized pick up and drop off locations, or as preventing physical interactions or exchanges between pedestrians and occupants of vehicles where the vehicle is lawfully stopped or pulled over outside of a travel lane, or parked at a location where on-street parking is permitted.

Albuquerque, N.M., Code of Ordinances § 8-2-7-2(F).

including pamphleteering to motorists"—all in or around "areas affected by the Ordinance." *Id.* at 24. For example, one of the Plaintiffs, Rhonda Brewer, solicits donations from motorists to pay for everyday needs; to increase her chances of garnering a donation, she stands on medians and near highway ramps in heavily-trafficked areas, holding a sign directed at stopped traffic. Two other Plaintiffs, David McCoy and Mary O'Grady, regularly donate money, food, and hygiene products to roadside solicitors from their parked cars—including solicitors on medians and near highway ramps. And Plaintiff Marissa Elyse Sanchez uses medians near busy intersections to demonstrate for particular political causes and distribute literature to pedestrians and vehicle occupants.

The Ordinance, however, would force Plaintiffs to engage in their expressive speech and conduct in alternate locations, which they averred would be less effective or less safe. *See id.*, Vol. I, at 25–27, 32–34 (noting that Ms. Brewer's attempts to panhandle on sidewalks have "prove[n] to be ineffective" and that Mr. McCoy and Ms. O'Grady would likely be unable "to continue their expressive conduct if they were permitted to donate to panhandlers only if they pull off the road and pull into a parking lot or parking spot"); *id.*, Vol. II, at 339 (Pls.' Mot. for Summ. J., filed Apr. 12, 2019) (summarizing testimony in which Ms. Brewer and Ms. O'Grady maintain that "they felt safer soliciting and providing donations from vehicles stopped at a red light than elsewhere, like an isolated parking lot, particularly in areas affected by crime or violence"; and Ms.

9

Sanchez explaining that "medians offer a uniquely effective platform for speech"); *see also id.*, Vol. I, at 32 (alleging that, "[u]nder the City's . . . Ordinance, Plaintiffs will be unable to engage in their constitutionally protected expressive conduct without fear of citation or criminal prosecution"); *id.* at 36 ("By depriving individuals of the use of traditional public forums to engage in expressive activity, the Ordinance forces individuals to take their speech to other locations that are less effective channels for communicating protected speech."). Accordingly, Plaintiffs sought a declaratory judgment "holding that the . . . Ordinance violates the . . . First and Fourteenth Amendments to the Constitution" and an injunction "prohibiting the City from enforcing the . . . Ordinance." *Id.* at 40.[8]

Following discovery, the parties both moved for summary judgment. As is relevant to this appeal, Plaintiffs argued that the Ordinance was not narrowly tailored to advance the City's asserted interest in pedestrian safety. *See id.*, Vol.

---

[8] Plaintiffs originally alleged that the Ordinance was a content-based restriction on speech and, therefore, was constitutional only if the City established it met strict scrutiny. *See, e.g.*, Aplt.'s App., Vol. I, at 37–38 (alleging that the Ordinance "is content-based because it was proposed and adopted not out of true safety concerns but rather because of the City Council's desire to significantly decrease panhandling—a form of expression that falls squarely within the First Amendment's protections," and, thus, "the Ordinance is constitutional only if the City can demonstrate that it" meets strict scrutiny). However, on appeal Plaintiffs do not challenge the district court's conclusion that the Ordinance is content-neutral; instead, they argue it fails to qualify as a permissible time, place, and manner restriction under *intermediate* scrutiny. *See, e.g.*, Aplees.' Resp. Br. at 1 (setting forth the governing legal standards for this appeal and only citing caselaw analyzing time, place, and manner restrictions under intermediate scrutiny).

II, at 335–36 (noting that "the First Amendment does not allow the City to cut off all expressive activities in traditional public forums merely by invoking . . . 'safety' as a talisman," and arguing that the Ordinance is not narrowly tailored because "[i]ts prohibitions sweep far more broadly than the City's putative safety concerns" by "banning speech in an array of contexts where there is no conceivable risk to driver or pedestrian safety").

Specifically, Plaintiffs contended that, while the City "maintained that it enacted the Ordinance to address safety concerns," it "collected no empirical data about accidents involving pedestrians" nor, more specifically, "compiled any data describing injuries or fatalities involving pedestrians standing on medians or near highway ramps or interacting with vehicle occupants." *Id.* at 343–44; *see also id.* at 354, 367 (contending that the City had adduced no evidence "demonstrating a real and concrete harm—much less a substantial one—that could possibly justify" the Ordinance's "broad prohibition[s]").

Indeed, according to Plaintiffs, scores of accident reports produced by the City actually *belied* any assertion that pedestrian presence near highway ramps or on medians, or pedestrian involvement in physical exchanges with vehicle occupants, gave rise to significant safety concerns warranting the Ordinance. *See id.* at 345, 368 (asserting that, out of 900 accident reports produced, "only four" involved conduct specifically proscribed by subsections (B) and (C) of the Ordinance, and "only 20 involved conduct arguably implicating [s]ubsections (D)

11

and (E)").  As well, Plaintiffs argued that the Ordinance was not narrowly tailored to any of the City's purported interests and they faulted the City in particular for failing to consider less-speech-restrictive alternatives for promoting traffic safety. *See id.* at 360–65, 371 (arguing, *inter alia*, that the City has an array of laws already enacted that could ameliorate traffic safety problems; that such laws would also address the City's purported issues with pedestrians standing near ramps, standing on medians, and engaging in physical exchanges with vehicle occupants; and that, "[e]ven if the City had evidence to demonstrate that its existing laws [were] insufficient," its failure to consider or try alternatives that burdened less speech was indicative of a lack of narrow tailoring).

In response, the City maintained that it had "adduced evidence that the Ordinance focuses specifically on locations that are not designed for pedestrian use" and, therefore, the Ordinance was narrowly tailored to its significant interests. *Id.*, Vol. IV, at 1009 (City of Albuquerque's Resp. in Opp'n to Pls.' Mot. for Summ. J., filed May 10, 2019); *see also id.* at 1013–14 (arguing that the City has an interest in reducing pedestrian-vehicle conflicts "as a matter of law" (bold-face font omitted)).  In particular, the City leaned heavily on general "traffic design and engineering principles" in claiming that the Ordinance was narrowly tailored. *Id.* at 1014; *see also id.* at 1016 (citing the expert opinions of Melissa Lozoya, a City employee and engineer, who stated, broadly, that the

Ordinance proscribed pedestrian presence in and around areas "not designed for pedestrian use").

Because its ambit was "limited to specific locations within the roadway that are not designed for pedestrian use or for pedestrian-vehicle interactions," said the City, the Ordinance was sufficiently tailored to pass constitutional muster. *Id.* at 1019. The City further emphasized that the Ordinance was "proactive" and that, without such a forward-looking approach, the City's "present interest" in reducing pedestrian-vehicle conflicts could only be achieved less effectively. *Id.* at 1022. Finally, the City objected to the notion that it was required to consider or to "adopt narrower alternatives" prior to passing the Ordinance. *Id.* at 1023.

## C

In August 2019, the district court granted Plaintiffs' summary judgment motion in substantial part, concluding that subsections (B) through (E) of the Ordinance facially violated the First Amendment. In pertinent part,[9] the court

_____

[9]    The district court made a number of rulings that are not disputed on appeal. First, the district court concluded that Plaintiffs' activities constituted speech and expressive conduct that the First Amendment protects. *See Martin*, 396 F. Supp. 3d at 1019 ("Plaintiffs assert that the various types of speech that they commonly engage in, including passively soliciting donations by holding signs on medians and exit and entrance ramps, providing donations from a vehicle while stopped in traffic, and handing out informational leaflets to motorists, 'fall within the heartland of constitutionally protected speech.' The City does not dispute this assertion, and the [c]ourt agrees that Plaintiffs' activities constitute protected speech." (citation omitted) (quoting Aplt.'s App., Vol. II, at 348)). Second, the court found that subsections (B) through (E) of the Ordinance "implicate traditional public fora." *See id.* at 1021. Third, the district court ruled

(continued...)

concluded that, although the City has a significant interest in promoting pedestrian safety and, in particular, reducing pedestrian-vehicle conflicts, the Ordinance was not narrowly tailored to serve or advance that interest. Construing the facts in the light most favorable to the City, as the non-movant on the issue of narrow tailoring, *see Martin v. City of Albuquerque*, 396 F. Supp. 3d 1008, 1028 n.11 (D.N.M. 2019), the court applied what it called the "roadmap for conducting a narrow tailoring inquiry" outlined in the Supreme Court's decision in *McCullen v. Coakley*, 573 U.S. 464 (2014), *id.* at 1029. Under that roadmap, "while the existence of a significant government interest may be adequately supported by prior caselaw and common sense, the government must present case-specific evidence that the restriction actually serves the stated goal without burdening too much speech in order to satisfy the narrow tailoring inquiry." *Id.*

However, the court recognized that our precedent had discerned in *McCullen*'s text a limitation on this government obligation. *See id.* at 1030. Specifically, the district court acknowledged that we had concluded in *Evans v. Sandy City* that *McCullen* "did not 'create a new evidentiary requirement for governments to compile data or statistics'" in order to establish the requisite narrow tailoring. *Id.* (quoting *Evans v. Sandy City*, 928 F.3d 1171, 1181 (10th Cir. 2019), *amended and superseded on reh'g*, 944 F.3d 847 (10th Cir. 2019)).

---

[9](...continued)
that the Ordinance is content neutral. *See id.* at 1023–27.

Although *McCullen* "did not lay out a 'new rule' regarding narrow tailoring, as the court reasoned, it makes clear that," to demonstrate such tailoring, the government "bears the burden of producing concrete evidence"—in "some form"—"to show that its proposed restriction will actually achieve its asserted interest without burdening substantially more speech than necessary." *Id.* at 1031.

In the district court's eyes, the City did not carry this burden on any of the subsections at issue—that is, subsections (B)–(E). As to subsection (B), the court found that the City's evidence of narrow tailoring was deficient. To justify this regulation, the City pointed to the Ordinance's preamble, which "repeatedly reference[d] a University of New Mexico Study that focused on the ten intersections in Albuquerque with the highest numbers of pedestrian and bicyclist-involved crashes and proposed five categories of 'countermeasures' to improve pedestrian and bicyclist safety at these intersections." *Id.* at 1032. However, that Study "d[id] *not* recommend a blanket ban on pedestrian presence in certain areas," which, to the court, "demonstrate[d] that the Study may be strong evidence that a pedestrian-vehicle conflict problem *exists*, but is not strong evidence that each provision of the Ordinance is narrowly tailored to address that problem." *Id.*

Beyond the Study, the City cited "'alarming' [national traffic] statistics concerning pedestrian fatalities in Albuquerque" and "anecdotal experiences" of

15

police officers, city councilors, and constituents. *Id.* But even giving "great weight" to the police department's "observations and perceptions of safety risks" in the City, according to the court, "these statistics and anecdotes . . . offer[ed] no concrete evidence that the restrictions the City ultimately chose to enact were actually tailored to address the issue" of pedestrian safety. *Id.* Nor was the court impressed by the City's expert, Melissa Lozoya, whose "sweeping" opinions "betray[ed] the lack of narrow tailoring" with respect to subsection (B). *Id.* at 1032–33. Accordingly, because the City "failed . . . to show that *all* pedestrian presence near *all* the ramps covered by the Ordinance is equally dangerous and must be completely prohibited in order to successfully minimize pedestrian-vehicle conflicts," the court found subsection (B) to be insufficiently tailored to pass constitutional muster. *Id.* at 1033.

The court reached the same conclusion regarding subsection (C). As with its evidence supporting subsection (B), the City's "evidence that the medians covered by [s]ubsection (C) are 'only those medians that pose risks to pedestrian safety' [wa]s . . . limited to general traffic safety design principles that highlight the dangers associated with standing in proximity to moving traffic." *Id.* at 1034. But as the court reasoned, "general design principles" are "simply not strong enough evidence to show that the City's decision to apply the median ban to all those medians narrower than six feet was a narrowly tailored decision to advance the goal of reducing pedestrian-vehicle accidents." *Id.* As well, "the City's

16

proffered anecdotal evidence supporting the Ordinance d[id] not directly address why banning standing in most medians less than six feet wide [wa]s a narrowly tailored restriction." *Id.* Indeed, according to the court, the analysis of the City's accident data by Plaintiffs' expert "show[ed] generally that the majority of the vehicle-pedestrian conflicts reported in Albuquerque over a four-year period would not have been prevented by the prohibitions contained in the Ordinance." *Id.* at 1034–35.

Crucially, the district court also faulted the City for "fail[ing] to mount an argument as to why other measures with less speech-restrictive impacts would [not] . . . achieve the goal of reducing pedestrian-vehicle conflicts in Albuquerque." *Id.* at 1035. And the court reasoned that the City's reliance on an "attenuated chain of 'proactive enforcement' [was] not enough to support such a broad restriction of First Amendment rights," nor had the City "offered any analysis here—even an estimate—of what percentage of *medians* in the City would remain available for expressive speech under the Ordinance, beyond an estimate of what percentage of total *roadways* would be implicated by Subsection (C)." *Id.* (citation omitted). Thus, while it was "quite possible to craft a narrowly tailored ordinance that addresses a public safety concern related to pedestrian presence on medians"—as Sandy City did in *Evans*—the court reasoned that Albuquerque "must offer evidence that proves 'alternative measures that burden substantially less speech would fail to achieve the government's

17

interests, not simply that the chosen route is easier,'" which it did not do with regard to subsection (C). *Id.* (quoting *McCullen*, 573 U.S. at 495).

Finally, the court determined subsections (D) and (E) were not narrowly tailored for many of the same reasons applicable to subsections (B) and (C). At bottom, the City "ha[d] not presented sufficient evidence that the physical exchange ban achieve[d] the goal of reducing pedestrian-vehicle conflicts without burdening substantially more speech than necessary." *Id.* While the court believed the City had "ample reason" to prohibit certain pedestrian-motorist exchanges, for example, "[a] motorist who, several travel lanes from the median, waves money at a pedestrian and encourages him to run across travel lanes, during which time the light turns green"—it found that the exchange regulation proscribed a much wider swath of conduct than this. *Id.* at 1035–36. And, more broadly, the City proffered virtually no evidence that exchanges prohibited by the regulation in fact obstructed traffic or endangered pedestrian safety. *See id.* at 1036.

In sum, then, the district court ruled that "prohibiting all access to" certain public fora "on the ground that Albuquerque struggles with troublingly high rates of pedestrian-vehicle conflicts, without presenting any evidence beyond anecdotal and personal speculation that the [Ordinance] would *actually* reduce the number of such conflicts in the City and that less sweeping restrictions would not suffice," ran "afoul of the First Amendment." *Id.* Consequently, the court

18

granted Plaintiff's motion for summary judgment in relevant part and found subsections (B) through (E) of the Ordinance unconstitutional. *See id.* at 1036–37.

## II

On appeal, the City challenges the district court's grant of summary judgment to Plaintiffs. We review that grant de novo, "applying the same standard as the district court." *iMatter Utah v. Njord*, 774 F.3d 1258, 1262 (10th Cir. 2014). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "When applying this standard," we review "the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Doe v. City of Albuquerque*, 667 F.3d 1111, 1122 (10th Cir. 2012) (quoting *Com. Union Ins. Co. v. Sea Harvest Seafood Co.*, 251 F.3d 1294, 1298 (10th Cir. 2011)).

Furthermore, "[b]ecause this [case] implicates First Amendment freedoms, we perform an independent examination of the whole record in order to ensure that the judgment protects the right of free expression." *Evans*, 944 F.3d at 852; *see Aptive Env't, LLC v. Town of Castle Rock ("Aptive")*, 959 F.3d 961, 978 (10th Cir. 2020) ("In a First Amendment case, we have 'an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free

19

expression.'" (quoting *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1219 (10th Cir. 2007))); *see also First Unitarian Church of Salt Lake City v. Salt Lake City Corp.*, 308 F.3d 1114, 1120 (10th Cir. 2002) ("Because First Amendment interests are involved, we have an obligation to conduct an independent review of the record and to examine constitutional facts and conclusions of law de novo." (quoting *Z.J. Gifts D-2, LLC v. City of Aurora*, 136 F.3d 683, 685 (10th Cir. 1998)), *cert. denied*, 539 U.S. 941 (2003)).[10]

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I; *see also iMatter Utah*, 774 F.3d at 1263 ("At its core, 'the First Amendment reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" (quoting *Boos v. Barry*, 485 U.S. 312, 318 (1988))); *Pahls v. Thomas*, 718 F.3d 1210, 1229 (10th Cir. 2013) ("At the core of the First Amendment is the idea that 'government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972))).  "By incorporation through the Fourteenth Amendment, this prohibition applies to states and their political subdivisions." *Aptive*, 959 F.3d at 979; *accord McCraw*, 973 F.3d at

---

[10]    This independent obligation to examine the record, however, "does not excuse the parties from their requirement under Federal Rule of Appellate Procedure 28 to cite to the 'parts of the record on which [they] rel[y].'" *McCraw*, 973 F.3d at 1065 n.4 (alterations in original) (quoting FED. R. APP. P. 28(a)(8)(A), 28(b)).

1065. As well, the First Amendment "applies not only to legislative enactments, but also to less formal governmental acts," including city policies like the Ordinance at issue. *Evans*, 944 F.3d at 852 (quoting *Hawkins v. City & Cnty. of Denver*, 170 F.3d 1281, 1286 (10th Cir. 1999)); *accord Aptive*, 959 F.3d at 979. Thus, here, the burden falls on the City to establish the Ordinance is constitutional. *See, e.g., Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Mun. of Golden*, 744 F.2d 739, 746 (10th Cir. 1984) ("[W]hen a law infringes on the exercise of First Amendment rights, its proponent bears the burden of establishing its constitutionality."); *accord iMatter Utah*, 774 F.3d at 1263.

### III

### A

On appeal, the City's primary contention is that the district court "erred in granting summary judgment to Plaintiffs on narrow tailoring grounds," despite the City presenting what it characterizes as "ample evidence supporting the Ordinance's restrictions."[11] Aplt.'s Opening Br. at 29; *see id.* at 4, 30 (describing

---

[11]     The City also argues that the district court erred by improperly resolving genuine disputes of material fact as to the question of narrow tailoring, and by improperly construing the facts in the light most favorable to *Plaintiffs*, the movants. *See* Aplt.'s Opening Br. at 5, 31–32. Because our review is de novo, however, we need not separately consider this argument. *See, e.g.*, *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 920 (10th Cir. 2004) ("Because our review is de novo, we need not separately address Plaintiff's argument that the district court erred by viewing evidence in the light most favorable to the City and by treating disputed issues of fact as undisputed."); *accord Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 947 (10th Cir. 2011); *cf. Lincoln v. BNSF Railway*

(continued...)

the City's first appellate issue as "[w]hether the district court's narrow tailoring analysis placed too great an evidentiary burden on the City," in contravention of our caselaw, and later asserting that the district court's narrow tailoring analysis was "too strict"); *see* Aplees.' Resp. Br. at 22 ("The City's principal argument is that the district court applied the wrong legal standard; according to the City, 'the district court misapplied *McCullen*' by adopting a 'more stringent' narrow-tailoring inquiry than the one this Court applied in *Evans*." (quoting Aplt.'s Opening Br. at 33)).

Indeed, the parties train nearly all their argumentative firepower on the narrow tailoring prong of our multi-pronged First Amendment analysis, contesting not only the type and quantum of evidence our caselaw demands to establish narrow tailoring, but also whether the City was required to try, or at least consider, alternate, equally-effective restrictions that burden less speech before settling on the Ordinance. We agree with the parties that the Ordinance's fate turns on our disposition of this prong. And we ultimately conclude that subsections (B) through (E) of the Ordinance are not narrowly tailored and, thus, violate the First Amendment.

---

[11](...continued)
*Co.*, 900 F.3d 1166, 1180 (10th Cir. 2018) ("In reviewing a grant of summary judgment, 'we "need not defer to factual findings rendered by the district court."'" (quoting *Amparan v. Lake Powell Car Rental Cos.*, 882 F.3d 943, 947 (10th Cir. 2018))).

To begin, however, we recognize that, in resolving First Amendment claims like Plaintiffs', ordinarily we would be obliged to answer a series of antecedent, predicate questions, such as the following: (1) whether Plaintiffs' speech and conduct are protected under the First Amendment; (2) whether the areas impacted by the Ordinance's relevant subsections are "traditional public fora," or are, instead, nonpublic fora; and (3) whether the Ordinance regulates speech in these particular fora without regard to its content.  More specifically, ordinarily, our First Amendment analysis would proceed in several steps.  First, we would ask whether Plaintiffs' activities "constitute[] protected speech under the First Amendment."  *Evans*, 944 F.3d at 852; *see also Verlo v. Martinez*, 820 F.3d 1113, 1128 (10th Cir. 2016).  If Plaintiffs demonstrate that their activities fall within the First Amendment's ambit, we then would "identify whether the challenged restrictions affect a public or nonpublic forum"; this identification process reveals the appropriate standard of review applicable to the Ordinance.  *McCraw*, 973 F.3d at 1065 (quoting *Verlo*, 820 F.3d at 1128).

However, the parties' framing of their appellate arguments permit us to refrain from opining on these otherwise important antecedent questions.  *See State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 885 (10th Cir. 2021) ("The principle of party presentation is a fundamental premise of our adversarial system.  That means 'we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.'" (citation omitted)

23

(quoting *United States v. Sineneng-Smith*, --- U.S. ----, 140 S. Ct. 1575, 1579 (2020))); *see also Greenlaw v. United States*, 554 U.S. 237, 243 (2008) ("In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation."); *Utah Poultry Producers Co-op v. Union Pac. R.R. Co.*, 147 F.2d 975, 977 (10th Cir. 1945) (noting that "it is not necessary for us to decide this [particular issue], because this is not the issue as framed by the parties"). More specifically, insofar as the parties do not dispute the answers to these predicate questions on appeal, they have effectively "waived (i.e., abandoned)" any arguments that could have put the answers at issue and obliged us to opine regarding them. *United States v. Yelloweagle*, 643 F.3d 1275, 1280 (10th Cir. 2011), *cert. denied*, 556 U.S. 964 (2012); *accord Tran v. Trs. of State Colleges*, 355 F.3d 1263, 1266 (10th Cir. 2004); *Bronson v. Swensen*, 500 F.3d 1099, 1104–05 (10th Cir. 2007). Accordingly, for purposes of resolving this appeal, we accept the parties' effective resolution of these questions, without opining on them ourselves.

Thus, to start, the City does not challenge the district court's finding that Plaintiffs carried their threshold burden of showing their speech and conduct are protected by the First Amendment. In light of our caselaw, this is not surprising. *See McCraw*, 973 F.3d at 1064–67 (finding that plaintiffs who, while on medians, "held campaign signs and t[ook] part in political protests," "garner[ed] signatures for petitions," "panhandle[d]," distributed newspapers, and conversed with

24

companions while jogging, *all* engaged in protected speech); *Doe*, 667 F.3d at 1118–20 (recognizing that the First Amendment includes "not just a right of free speech, but also a right to receive information"); *see also McCraw*, 973 F.3d at 1066–67 (noting that speech is protected by the First Amendment "[e]ven though [it] . . . may not amount to grand rhetoric or political soapbox oratory," or where the speaker "is simultaneously engaged in non-expressive activity," or where the government "has deemed [the] speech valueless"); *cf. Evans*, 944 F.3d at 852–53 (assuming, without deciding, that panhandling is protected under the First Amendment based on, *inter alia*, "several of our sister circuits who [have] . . . determined panhandling is protected" and the Supreme Court's recognition that "solicitation of charitable contributions is protected speech" (quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 789 (1988))).

Likewise, while the City mounted a forum analysis challenge in the district court, it does not contest on appeal the district court's conclusion that the subsections of the Ordinance at issue restrict speech in traditional public fora. *See* Aplt.'s Opening Br. at 29 (focusing its appellate argument on whether "the district court erred in granting summary judgment to plaintiffs on narrow tailoring grounds"). "Under First Amendment jurisprudence, 'the extent to which the Government can control access [to Government property] depends on the nature of the relevant forum.'" *Evans*, 944 F.3d at 853 (alteration in original) (quoting

25

*Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 800 (1985)).[12]

Traditional public fora, which "occupy a 'special position in terms of First Amendment protection,'" "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *McCullen*, 573 U.S. at 476 (first quoting *United States v. Grace*, 461 U.S. 171, 180 (1983); and then quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009))); *accord Evans*, 944 F.3d at 853 ("A traditional public forum is a place that 'by long tradition or by government fiat ha[s] been devoted to assembly and debate.'" (alteration in original) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983))). "In these traditional public fora, the government's right to 'limit expressive activity [is] sharply circumscribed.'" *Verlo*, 820 F.3d at 1129 (alteration in original) (quoting *Perry Educ. Ass'n*, 460

---

[12]    Generally speaking, we recognize "three types of speech fora: the traditional public forum, the designated public forum, and the nonpublic forum." *Verlo*, 820 F.3d at 1129; *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46 (1983); *Evans*, 944 F.3d at 853.   We describe a "traditional public form" in the main text *infra*.  "A designated public forum is public property, not constituting a traditional public forum, which the government has intentionally opened to the public for expressive activity"; so long as the government keeps this property open to expressive activity, "it is bound by the same standards as apply in a traditional public forum." *Verlo*, 820 F.3d at 1129 (quoting *Perry Educ. Ass'n*, 460 U.S. at 46).  All other fora are "nonpublic fora," access to which the government can restrict in reasonable, viewpoint-neutral ways.  *See id.*

26

U.S. at 45); *see Grace*, 461 U.S. at 177 (noting that, in public fora, "the government's ability to permissibly restrict expressive conduct is very limited"); *Perry Educ. Ass'n*, 460 U.S. at 45 (noting that, in "quintessential public forums, the government may not prohibit all communicative activity"); *see also Summum*, 555 U.S. at 469 (recognizing that "members of the public retain strong free speech rights when they venture into" traditional public fora).

The magnitude of the burden the government must carry to justify its regulation depends on whether the regulation's restriction on speech is deemed content-based or content-neutral.  Content-based regulations of speech—i.e., regulations "based upon either the content or the subject matter of the speech"—must meet strict scrutiny, whereas content-neutral regulations of speech—i.e., regulations "justified without reference to the content of the regulated speech"—must meet intermediate scrutiny.  *Pahls*, 718 F.3d at 1229 (first quoting *Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 536 (1980); and then quoting *Ward*, 491 U.S. at 791).

While Plaintiffs initially alleged in the district court that the Ordinance was a content-based measure aimed at panhandlers, they do not raise such an argument on appeal, claiming instead that the Ordinance, even if content-neutral, cannot satisfy intermediate scrutiny.  The City, for its part, has maintained throughout the litigation that the Ordinance's purpose is to promote pedestrian safety and, more specifically, to reduce pedestrian-vehicle conflicts, without regard to the

content of any particular individual's speech.  Thus, without dispute on this point

on appeal, we assume the Ordinance is content-neutral and subject to intermediate

scrutiny.

In sum, taking into account how the parties' appellate arguments have

framed this dispute, we may assume for purposes of our decision the following

answers to the aforementioned predicate questions: (1) Plaintiffs' speech and

conduct enjoy First Amendment protection; (2) subsections (B) through (E)

impact traditional public fora; and (3) the Ordinance is content neutral.  These

answers, together, provide the appropriate standard of review, which we apply

here—that is, intermediate scrutiny.  Under that standard, to establish that its

content-neutral Ordinance is constitutional, the City must show that the Ordinance

is narrowly tailored to achieving significant government interests, and that the

Ordinance leaves open ample alternative channels of communication.  *See Verlo*,

820 F.3d at 1134 ("[I]n a public forum, the government can restrict speech

through 'content-neutral time, place, and manner restrictions that: (a) serve a

significant government interest; (b) are narrowly tailored to advance that interest;

and (c) leave open ample alternative channels of communication.'" (quoting *Doe*,

667 F.3d at 1130–31)); *see also McCraw*, 973 F.3d at 1070 (applying

"intermediate scrutiny" to an analogous city restriction of speech); *Am. Target

Advert., Inc. v. Giani*, 199 F.3d 1241, 1247 (10th Cir. 2000) (noting that where

28

"the Act is content neutral . . we accordingly subject it to intermediate scrutiny"), *cert. denied*, 531 U.S. 811 (2000).

**B**

With these predicate questions answered, we turn our attention to the "hotly contested question" in this case: whether Albuquerque's Ordinance is narrowly tailored to serve a significant government interest. *Evans*, 944 F.3d at 856. As noted, the City bears the burden of making the requisite narrow tailoring showing. *See Doe*, 667 F.3d at 1133. As detailed below, we conclude that the City has not successfully carried this burden.

In brief, we reach that conclusion for two principal reasons. First, the evidence that the City relies on to make its narrow tailoring showing does not indicate that the Ordinance alleviates in a direct and material way a real, non-speculative harm; relatedly, the City is unable to establish that the Ordinance does not burden substantially more speech than necessary to further its interest in pedestrian safety. Second, the City has almost completely failed to even *consider* alternative measures that restrict or burden the speech at issue *less* severely than does the Ordinance—which underscores its failure to demonstrate that the Ordinance is narrowly tailored to achieve its professed significant governmental interests in pedestrian safety. In explaining this second reason, we address and harmonize a possible tension between our two recent decisions examining content-neutral time, place, or manner regulations in public fora—*Evans* and

29

*McCraw*—and, in particular, between their respective discussions of what role, if any, a less-restrictive (i.e., less-burdensome) means analysis plays in the narrow tailoring inquiry.[13]  We turn to that detailed examination now.

**1**

"For a content-neutral time, place, or manner regulation to be narrowly tailored, it must not burden substantially more speech than is necessary to further the government's legitimate interests."  *McCraw*, 973 F.3d at 1071 (quoting *McCullen*, 573 U.S. at 486); *accord Ward*, 491 U.S. at 799; *Evans*, 944 F.3d at 856; *cf. Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002) ("If the First Amendment means anything, it means that regulating speech must be a last—not first—resort.").  "In other words, the government 'may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to

---

[13]    For purposes of our discussion of the "less-restrictive means" analysis, we discern no material, conceptual distinction between this term and related terms, such as "less-restrictive alternatives" or "less-burdensome alternatives" or "less-burdensome means," or "less-intrusive means."  *See, e.g.*, *McCullen*, 573 U.S. at 492, 496 (discussing the government's "failure to look to less intrusive means" and "less restrictive measures"); *McCraw*, 973 F.3d at 1074–76 (using the term "less burdensome alternatives" but relying on authority, like *McCullen*, which, as noted, uses other terminology)*; Evans*, 944 F.3d at 859–60 (discussing "less restrictive means analysis" and appearing to use the term "less restrictive alternatives" synonymously); *see also McCullen*, 573 U.S. at 495 ("To meet the requirement of narrow tailoring, the government must demonstrate that *alternative measures that burden substantially less speech* would fail to achieve the government's interests, not simply that the chosen route is easier." (emphasis added)).  Such terms are used synonymously in this opinion.

advance its goals.'"  *Evans*, 944 F.3d at 856 (quoting *McCullen*, 573 U.S. at 486).

This narrow tailoring requirement not only "guard[s] against an[y] impermissible desire to censor," but, more significantly, "prevents the government from too readily 'sacrific[ing] speech for efficiency'" by "demanding a close fit between ends and means."  *McCullen*, 573 U.S. at 486 (third alteration in original) (quoting *Riley*, 487 U.S. at 795); *accord Evans*, 944 F.3d at 856; *see also McCraw*, 973 F.3d at 1071 (explaining that the narrow tailoring burden "ensures that restrictions on speech are not permitted when either the harms *or* the remedial effects of the government's restrictions are supported only by speculation or conjecture, *or* when the regulation burdens substantially more speech than is necessary to further the government's legitimate interests" (emphases added)).[14]

---

[14]    In *McCraw*, we stated that, "[f]or a content-neutral time, place, or manner regulation to be narrowly tailored, it must not burden substantially more speech than is necessary to further the government's legitimate interests."  *McCraw*, 973 F.3d at 1071 (quoting *McCullen*, 573 U.S. at 486).  We explained further that the narrow tailoring requirement "ensures that restrictions on speech are not permitted when *either* [1] the harms or the remedial effects of the government's restrictions are supported only by speculation or conjecture, *or*"—as already stated—"[2] when the regulation burdens substantially more speech than is necessary to further the government's legitimate interests."  *Id.* (emphases added).  The second portion of this explanation is drawn directly from *McCullen* and other cases examining content-neutral time, place, or manner restrictions on private speech in public fora; the *first* portion, though, is drawn from caselaw examining restrictions on *commercial* speech—which, to be sure, we have recognized as closely analogous to cases grappling with time, place, and manner restrictions.  *See id.* at 1071 n.9 (recognizing that "we have applied commercial speech precedent when analyzing time, place, and manner

(continued...)

---

[14](...continued)
restrictions" because the "validity of [such] . . . restrictions is determined under a standard essentially identical to that governing the regulation of commercial speech" (quoting *Citizens for Peace in Space*, 477 F.3d at 1220 n.3)); *cf. United States v. Edge Broad. Co.*, 509 U.S. 418, 430–31 (1993) (noting that "[t]he *Ward* holding is applicable" in the commercial speech context because "we have observed that the validity of time, place, or manner restrictions is determined under standards very similar to those applicable in the commercial speech context and that it would be incompatible with the subordinate position of commercial speech in the scale of First Amendment values to apply a more rigid standard to commercial speech than is applied to fully protected speech").

That said, our articulation of the standard governing commercial speech restrictions differs slightly from the traditional articulation of the standard governing content-neutral time, place, and manner restrictions. *Compare Aptive*, 959 F.3d at 987 (noting that the test governing restrictions on commercial speech is "a form of 'intermediate standard of review'" and "provides that in determining whether commercial speech may be proscribed, we must ask [1] whether the State's interests in proscribing it are substantial, [2] whether the challenged regulation advances these interests in a direct and material way, and [3] whether the extent of the restriction on protected speech is in reasonable proportion to the interests served." (brackets in original) (block quote formatting omitted) (quoting *Edenfield v. Fane*, 507 U.S. 761, 767 (1993))), *with Evans*, 944 F.3d at 854 ("It is well-settled 'that even in a public forum the government may impose reasonable restrictions on the time, place, [or] manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of [the] information."'" (quoting *Ward*, 491 U.S. at 791)), *and Citizens for Peace in Space*, 477 F.3d at 1219–20 ("The government may impose reasonable time, place, and manner restrictions on speech in public forums provided the restrictions are (1) content neutral, (2) that they are 'narrowly tailored to serve a significant governmental interest,' and (3) that they 'leave open ample alternative channels for communication.'" (quoting *Ward*, 491 U.S. at 791)); *see also iMatter Utah*, 774 F.3d at 1266 (articulating the constitutional test for time, place, and matter regulations as requiring that such regulations "(1) are content neutral; (2) are 'narrowly tailored to serve a significant governmental interest;' (3) 'leave open ample alternative channels for communication;' and (4) 'do not delegate overly broad licensing discretion to a government official'" (first quoting

(continued...)

[14](...continued)
*McCullen*, 573 U.S. at 477; and then quoting *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992))).

In *McCraw* we incorporated the *second* prong of the commercial speech framework as a facet of our "narrow tailoring" analysis. *See McCraw*, 973 F.3d at 1071–74 (explaining that the narrow tailoring burden is not met when, *inter alia*, "the harms or the remedial effects of the government's restrictions are supported only by speculation or conjecture," concluding that Oklahoma City's "evidence [was] insufficient to demonstrate that the [c]ity's 'recited harms are real' or that the . . . [o]rdinance 'will in fact alleviate these harms in a direct and material way,'" and *further* concluding that the regulation burdened substantially more speech than necessary based on "many of the same weaknesses . . . identified when analyzing whether the [c]ity's evidence met its burden to show the existence of a real, non-conjectural harm" (quoting *Citizens for Peace in Space*, 477 F.3d at 1221)); *see also id*. at 1073–74 (noting that Oklahoma City's failure to present evidence "of concrete harm arising from the presence of pedestrians on its medians"—which the ordinance at issue was intended to impact—"infect[ed] our analysis of both the 'ends' and the 'means'"). *McCraw* drew on our prior decision in *Citizens for Peace in Space*, where we similarly utilized the second prong of the commercial speech framework to assess whether a content-neutral regulation of speech or expressive conduct in a public forum was narrowly tailored. *See* 477 F.3d at 1220–21 ("'Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.' *Thus*, in order to demonstrate that a challenged restriction is narrowly tailored, the government must demonstrate that the restriction 'serve[s] a substantial state interest in a direct and effective way.'. . . [A] regulation is not narrowly tailored when it 'does not sufficiently serve those public interests that are urged as its justification.' . . . [T]he burden falls on the [c]ity to show that its 'recited harms are real . . . and that the regulation will in fact alleviate these harms in a direct and material way.'" (first alteration and third omission in original) (emphasis added) (citations omitted) (first quoting *Ward*, 491 U.S. at 799; then quoting *Edenfield*, 507 U.S. at 773; then quoting *Grace*, 461 U.S. at 181; and then quoting *Turner Broad. Sys. Inc. v. FCC*, 512 U.S. 622, 664 (1994))).

While *McCraw* and *Citizens for Peace in Space* quite explicitly incorporate this second prong of the commercial speech framework into our narrow tailoring inquiry for time, place, and manner restrictions, such an incorporation of this

(continued...)

---

[14](...continued)
prong (and especially its emphasis on whether the harm is concrete or real, and whether the government regulation addresses it in a direct and effective or material way) is at least *implicit* in other cases from this court and the Supreme Court. *See Evans*, 944 F.3d at 856, 858 (concluding that the ordinance at issue was narrowly tailored based in part on the "direct relationship" between "the [c]ity's goal of promoting public safety," the significance of which was uncontested, and "the restriction on speech [the city] selected," and finding that the restriction promoted this goal in "a direct and effective way"); *iMatter Utah*, 774 F.3d at 1266–67 (accepting "the general proposition that promoting public order and safety is a significant government interest," but finding that the state "failed to present any evidence that its [regulations] . . . actually address that interest," and, consequently, stating that, "[s]imply put, a regulation that has no discernible effect on an objective is not narrowly tailored to achieve that objective"); *cf. Doe*, 667 F.3d at 1130–33 (citing caselaw articulating the second prong of the commercial speech framework as a facet of the government's larger burden to establish a time, place, and manner regulation's constitutionality, and noting that the government's "invitation  . . . to imagine hypothetical justifications" for its regulation on a public forum, rather than presenting evidence of the "interests to be served" by the regulation, "obfuscate[d] our ability to determine" what those interests were); *cf. also McCullen*, 573 U.S. at 493 (expressing skepticism about the state's asserted significant interest in "preventing congestion in front of abortion clinics" because the state's record evidence "cite[d] to support th[is] anticongestion interest pertain[ed] mainly to one place at one time," and "[f]or a problem shown to arise only once a week in one city at one clinic, creating a 35-foot buffer zones at every clinic across [Massachusetts] [wa]s hardly a narrowly tailored solution"); *Ward*, 491 U.S. at 800 ("It is undeniable that the city's substantial interest in limiting sound volume is served *in a direct and effective way* by the [regulation] . . . ." (emphasis added)).

Ultimately, we need not determine, as a formal matter, the degree of analytical overlap between the second prong of the commercial speech framework and the narrow tailoring prong of the time, place, and manner framework. Suffice to say, we recognize, in light of our precedent, that the government, as a function of its overarching burden to establish that a content-neutral regulation of speech or expressive conduct in a public forum is narrowly tailored, must demonstrate not only that the regulation does not sweep too broadly, but also that the interests advanced as justifying the regulation are real, and not speculative—and that the

(continued...)

In applying this requirement, "[w]e look 'to the amount of speech covered by the ordinance and whether there is an appropriate balance between the affected speech and the governmental interests that the ordinance purports to serve.'" *Evans*, 944 F.3d at 856 (quoting *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 165 (2002)); *see McCraw*, 973 F.3d at 1071 ("In order to assess whether [an] . . . [o]rdinance is narrowly tailored, we must measure it against the [government's] asserted interest."); *see also iMatter Utah*, 774 F.3d at 1266 ("To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests." (quoting *McCullen*, 573 U.S. at 495)); *cf. Edenfield v. Fane*, 507 U.S. 761, 773 (1993) ("Where a restriction on speech lacks [a] close and substantial relation to the governmental interests

---

[14](...continued)
regulation addresses or ameliorates those interests in a direct manner.

Here, as explicated further *infra*—especially, in Part III.B.2.a—we conclude that Albuquerque lacks adequate record support for the notion that it faces real, concrete harms arising from pedestrian presence near highway ramps and on medians, or from pedestrian involvement in physical exchanges with vehicle occupants in travel lanes; relatedly, Albuquerque *also* fails to show that its Ordinance avoids burdening substantially more speech than necessary to achieve its interests in public safety and, more specifically, pedestrian safety—a conclusion that flows in part *from* the lack of record support just noted.

asserted, it cannot be, by definition, a reasonable time, place, or manner

restriction.").[15]

But while "fit matters" when it comes to content-neutral regulations of

speech, *iMatter Utah*, 774 F.3d at 1266 (quoting *McCutcheon v. Fed. Election

Comm'n*, 572 U.S. 185, 218 (2014) (plurality op.)), such regulations "'need not be

the least restrictive or least intrusive means of' serving the government's

interests," *McCullen*, 573 U.S. at 486 (quoting *Ward*, 491 U.S. at 798).  Rather,

"'the requirement of narrow tailoring is satisfied so long as the . . . regulation

promotes a substantial government interest that would be achieved less effectively

absent the regulation' without 'burden[ing] *substantially more* speech than is

necessary to further the government's legitimate interests.'"  *Doe*, 667 F.3d at

---

[15]    Moreover, we have stressed that governmental interests must not be
defined too generally.  *See, e.g., McCraw*, 973 F.3d at 1071 n.10 (acknowledging
that, while "a government's interest in public safety is clearly significant," "it is
not enough for the [government] to use broad safety justifications" as the impetus
for a speech regulation); *Citizens for Peace in Space*, 477 F.3d at 1223 ("The
narrowly tailored analysis proceeds from the *specific* security interest articulated
by the [c]ity.  Indeed, to assess whether a restriction is an appropriate 'fit' to
some important government interest, it is necessary that the government interest
be specifically defined.  Otherwise, the narrowly tailored analysis more closely
resembles the 'reasonably necessary' standard used in reviewing restrictions on
speech in areas that are not public forums." (citations omitted)); *cf. Bl(a)ck Tea
Soc'y v. City of Boston*, 378 F.3d 8, 13 (1st Cir. 2004) (opining, in the context of
a time, place, and manner restriction the city claimed was intended to "maintain
security" around the Democratic National Convention, that "security simpliciter is
too broad a rubric to be useful" in the narrow tailoring analysis; that "[s]ecurity is
not a talisman that the government may invoke to justify *any* burden on speech
(no matter how oppressive)"; and that the ultimate "question of narrow tailoring
must be decided against the backdrop of the harms that a particular set of
[responsive] measures are designed to forfend").

1133 (alteration and omission in original) (emphasis added) (quoting *Ward*, 491 U.S. at 799); *see Evans*, 944 F.3d at 856–57 ("So long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." (omission in original) (quoting *Ward*, 491 U.S. at 800)); *iMatter Utah*, 774 F.3d at 1266 (observing that, under the narrow tailoring framework, "the scope of the restriction on speech must be reasonably, though it need not be perfectly, targeted to address the harm intended to be regulated" (quoting *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 529 (1996) (O'Connor, J., concurring))).

"In other words, 'restrictions on the time, place, or manner of protected speech are not invalid simply because there is some imaginable alternative that might be less burdensome on speech.'" *iMatter Utah*, 774 F.3d at 1266 (quoting *Ward*, 491 U.S. at 797); *cf. Evans*, 944 F.3d at 857 ("'The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests' or the degree to which those interests should be promoted." (alteration in original) (quoting *Ward*, 491 U.S. at 800)).

**2**

The City, drawing heavily on our decision in *Evans v. Sandy City*, asserts that it "produced sufficient evidence to show that the Ordinance is narrowly tailored." Aplt.'s Opening Br. at 30. The City maintains that the Ordinance imposes a slight burden on speech and is limited in focus because it applies only to "areas in the roadway that are not designed for pedestrian use or for pedestrian-vehicle interactions and which are in close proximity to high-speed and high-volume traffic." *Id*. at 30–31; *see also id*. at 38–39 (arguing that the Ordinance, like the regulation in *Evans*, "does not impose a substantial burden on speech because" of its "limited application" to "locations within the roadway that are" not designed for pedestrian presence or that are near "high-speed and high-volume traffic"). Moreover, the City claims it has "introduced substantial evidence of safety risks arising from pedestrian activities in these locations." *Id*. at 31; *see also id*. at 45 (characterizing the Ordinance as the product of a "preventive approach based both on: (1) traffic engineering and roadway design concepts that focus on minimizing conflicts between pedestrians and vehicles by separating them, and (2) anecdotal evidence of real safety problems arising within the scope of the Ordinance's prohibitions").

The City also contends that the district court "imposed a much higher evidentiary burden on the City than [we] imposed on Sandy City in *Evans*." *Id*. at 45. In the City's eyes, it produced enough evidence to show that the Ordinance was "actually tailored to address" pedestrian safety, notwithstanding the district

38

court's alleged insistence on "concrete evidence" that showed such tailoring.  *Id*.

at 42 (quoting *Martin*, 396 F. Supp. 3d at 1032).  Lastly, the City objects to the

district court's conclusion that the "Ordinance was not narrowly tailored due to

the City's alleged failure to 'offer evidence . . . prov[ing] "alternative measures

that burden substantially less speech would fail to achieve [its] interests"'"—a

conclusion that, according to the City, runs counter to our holding in *Evans*.  *Id*.

at 44 (quoting *Martin*, 396 F. Supp. 3d at 1035).

The City's efforts to show narrow tailoring, however, are unavailing.  We

summarize our reasons as follows.  Fundamentally, the fit between the "means"

chosen by the City—subsections (B) through (E) of the Ordinance—and its

"ends"—reducing pedestrian-vehicle conflicts and otherwise keeping pedestrians

safe—is impermissibly poor because, as the record evidence reflects, the

Ordinance neither alleviates any real, non-speculative harms in a direct and

material (i.e., effective) way, nor otherwise advances the City's more abstract

safety rationales.  More specifically, the fact that the Ordinance burdens

substantially more speech than necessary to achieve the City's interest in

pedestrian safety is unmistakable when the Ordinance's expansive restrictions on

speech and expressive conduct are juxtaposed against the paltry record evidence

of real, non-speculative harms ameliorated by the Ordinance.  That the City

barely considered less-restrictive means—if it considered them at all—merely

39

underscores the fact that the City did not meaningfully tailor the Ordinance to address the interests or harms it identified.

Thus, because the Ordinance "regulate[s] expression in such a manner that a substantial portion of the burden on speech does not serve to advance [the City's] goals," it is not narrowly tailored and, consequently, violates the First Amendment. *Evans*, 944 F.3d at 856 (quoting *McCullen*, 573 U.S. at 486); *see McCraw*, 973 F.3d at 1071 ("In order to assess whether the [regulation] is narrowly tailored, we must measure it against the [government's] asserted interest."); *see also iMatter Utah*, 774 F.3d at 1266 ("[T]he scope of the restriction on speech must be reasonably, though it need not be perfectly, targeted to address the harm intended to be regulated." (quoting *44 Liquormart*, 517 U.S. at 529 (O'Connor, J., concurring)).

**a**

To assess whether the Ordinance is narrowly tailored, "we must measure it against the City's asserted interest[s]." *McCraw*, 973 F.3d at 1071; *see Doe*, 667 F.3d at 1132 ("[O]nly by discerning the interest to be served by a restriction can a court proceed to determine whether the restriction is sufficiently tailored to advance that interest."). Throughout the litigation, the City has claimed it enacted the Ordinance to promote pedestrian safety and, more specifically, to minimize pedestrian-vehicle conflicts. *See* Aplt.'s App., Vol. IV, at 997; Aplt.'s Opening Br. at 1. And Plaintiffs concede that Albuquerque "ha[s] an issue with

40

traffic safety" generally and that, in the abstract, the City has "a legitimate interest in protecting pedestrians and motorists from the hazards incident to vehicular traffic." Aplees.' Resp. Br. at 5–6.

But while the City's "interest in public safety is clearly significant," it is "not enough for the City to use broad safety justifications" to establish the Ordinance's necessity. *McCraw*, 973 F.3d at 1071 n.10. Rather, for our assessment of "whether [the Ordinance] is an appropriate 'fit' to some important government interest," the City must "specifically define[]" that interest, lest our narrow tailoring analysis "more closely resemble[] the 'reasonably necessary' standard used in reviewing restrictions on speech" in nonpublic fora. *Citizens for Peace in Space*, 477 F.3d at 1223; *see McCraw*, 973 F.3d at 1071 n.10 (noting that this specificity requirement is "critical to prevent restrictions on speech designed to advance other interests that would not on their own justify the burden on expression"); *see also supra* note 15.

Thus, "the burden falls on the City to show that its 'recited harms,'" specifically defined, "are real . . . and that the [Ordinance] will in fact alleviate the[m] . . . in a direct and material way"—and if the City is unable to demonstrate that the Ordinance provides more than "ineffective or remote support for [the City's stated] purpose," or "sufficiently serve[s] those public interests" in a "direct and effective [i.e., material] way," then we are constrained to conclude that the Ordinance is not narrowly tailored and, consequently, contravenes the

41

First Amendment. *Citizens for Peace in Space*, 477 F.3d at 1220–21 (first

omission in original) (first quoting *Turner Broad. Sys. Inc. v. FCC*, 512 U.S. 622,

664 (1994); then quoting *Edenfield*, 507 U.S. at 770; then quoting *Grace*, 461

U.S. at 181; and then quoting *Edenfield*, 507 U.S. at 773).

Independently examining the record before us under "our special standard

of de novo review," we find little evidence of non-speculative harms or interests

that the Ordinance's restrictions alleviate in a direct and material way. *McCraw*,

973 F.3d at 1071 (quoting *Citizens for Peace in Space*, 477 F.3d at 1219–20).

Broadly speaking, the City relies on three categories of evidence to argue that the

Ordinance materially alleviates significant traffic safety problems in

Albuquerque:

- the opinions of Melissa Lozoya, P.E., a "registered Professional Civil Engineer" and Deputy Director of the City's Department of Municipal Development, whom the City disclosed as its FED. R. Civ. P. 26(a)(2)(C) expert to testify regarding general traffic engineering and roadway design principles, *see* Aplt.'s App., Vol. I, at 217 (City of Albuquerque Expert Disclosure, dated Feb. 11, 2019) (disclosing Ms. Lozoya and averring that she may "testify regarding roadway design considerations that aim to minimize pedestrian-vehicle conflicts and how [the] Ordinance . . . specifically furthers that goal"); *see id.*, Vol. IV, at 1128 (Tr. Melissa Lozoya Dep., dated Mar. 18, 2019) (Ms. Lozoya testifying that she authored the disclosure herself);

- a series of accident reports the City produced in response to Plaintiffs' discovery requests in district court, *see* Aplt.'s Opening Br. at 40–41 (discussing "police reports that provided examples of pedestrians being harmed by

vehicles while standing on medians and of vehicles driving onto medians," along with "evidence of unsafe situations, including collisions, resulting from physical interactions between pedestrians and motorists in travel lanes"); and

• general statistical information, primarily compiled in the Ordinance's preamble, along with anecdotes from city councilors, police officers, and constituents, *see* Aplt.'s Opening Br. at 41.

None of this evidence, however, points to significant safety problems arising from pedestrian presence near ramps or on medians, or from exchanges between pedestrians and vehicle occupants—and, further, those safety problems to which the evidence *does* point are not likely to be ameliorated by the relevant subsections of the Ordinance. Thus, the City does not meet its burden of showing *either* that its recited harms relating to pedestrian presence nears ramps and on medians or pedestrian exchanges with vehicle occupants are real and non-speculative, or that the Ordinance alleviates these or any other harms invoked by the City in a direct and material way. *Cf. McCraw*, 973 F.3d at 1073–74 (noting that Oklahoma City's failure to "present[] . . . evidence of concrete harm arising from the presence of pedestrians on its medians" infected "our analysis of both the 'ends' and the 'means'" chosen by the city).

**i**

To start, arguably the central piece of evidence in the City's narrow tailoring argument is expert testimony offered by Ms. Lozoya. *See* Aplt.'s Opening Br. at 12–17, 39–40 (contending that "the City's safety rationale"

43

undergirding the Ordinance "is rooted in roadway design and traffic engineering concepts that call for separating pedestrian and motor vehicle traffic," and describing Ms. Lozoya's expert opinions on such concepts in detail); *see also generally* Aplt.'s App., Vol. IV, at 1013–24 (City of Albuquerque's Resp. to Pls.' Mot. for Summ. J., filed May 10, 2019).  The City presented Ms. Lozoya to testify about how the Ordinance "specifically furthers" the goal of "minimiz[ing] pedestrian-vehicle conflicts."  Aplt.'s App., Vol. I, at 217 (City of Albuquerque's Expert Disclosure, filed Feb. 11, 2019).  In particular, Ms. Lozoya averred in her expert disclosure that she would offer the following opinions at trial:

- "roadways are designed in an effort to minimize conflicts or interaction between vehicles, pedestrians, and bicyclists," such that "various users" of the roadways "are to remain within their designated zone" and—crucially—"pedestrian[s] and motor vehicles should not interact or share space within the roadway corridor";

- regarding subsection (C)'s median regulation, "medians in the City of Albuquerque generally are not designed to accommodate pedestrians for any purpose, whether it is to cross the street or to remain on the median for an extended time"; medians "that are designed to accommodate pedestrians" should be at least six feet wide, and preferably eight to ten feet wide, to "provide a comfortable and safer space for pedestrians . . . to wait for gaps in traffic"—but even medians at least six feet in width "are not designed to accommodate pedestrians . . . for long periods of time; and "medians that are off limits to pedestrians" under the Ordinance "are not designed to accommodate pedestrians" at all;

- regarding subsection (B)'s ramp regulation, the Ordinance's prohibition "against standing or congregating

on or near . . . the entrance or exit ramps of . . . [high-speed] roadways furthers the goal of avoiding dangerous pedestrian-vehicle conflicts"; and

• regarding subsection (D) and (E)'s exchange regulation, the Ordinance's prohibitions "against physical exchanges between pedestrians and vehicle occupants in a travel lane further[] the goal of avoiding dangerous pedestrian-vehicle conflicts," and "[a]llowing such physical exchanges to occur in travel lanes . . . would be contrary to the goal of minimizing [such] conflicts because it encourages pedestrians to leave the areas that are designed for pedestrian use and to venture into areas that are not."

*Id.* at 218–21.

In forming her opinions, Ms. Lozoya relied on "several nationally-accepted roadway design manuals and guidelines," such as guidelines from the National Association of City Transportation Officials ("NACTO"). Aplt.'s Opening Br. at 13–14; *see* Aplt.'s App., Vol. III, at 718–19 (Tr. Melissa Lozoya Dep., dated Mar. 18, 2019). The City cites her opinions as support for the ultimate goal it hopes to achieve through the Ordinance: "minimiz[ing], [or] pretty much eliminat[ing], conflicts between pedestrians and vehicles." Aplt.'s Opening Br. at 16 (quoting Aplt.'s App., Vol. IV, at 1130 (Tr. Melissa Lozoya Dep., dated Mar. 18, 2019)); *see also* Aplt.'s Reply Br. at 8 ("The Ordinance seeks to reduce pedestrian-vehicle conflicts by focusing on roadway design and traffic engineering concepts that call for separating pedestrian and motor vehicle traffic into areas designed for those modes of travel.").

45

But while the City frames much of its narrow tailoring argument around

Ms. Lozoya's opinions, these opinions lend minimal support to the notion that the

Ordinance does not burden substantially more speech than necessary, or that it

alleviates non-speculative harms in a direct and material way. Crucially, Ms.

Lozoya's opinions are theoretical, and largely unmoored from any on-the-ground

data regarding Albuquerque's traffic safety problems. Notably, the City concedes

that Ms. Lozoya's opinions are based on her "engineering experience" and

"roadway design manuals and guidelines"—but not, for example, on the accident

reports the City proffered in support of the Ordinance. Aplt.'s Opening Br. at 13,

17. And Ms. Lozoya herself confirmed during her deposition that she relied on

little, if any, data in formulating her opinions. *See* Aplt.'s App., Vol. II, at 325

(Tr. Melissa Lozoya Dep., dated Mar. 18, 2019) (Counsel: "So is it safe to say

you didn't review any collision reports in order to come to the conclusions in

your Expert Disclosure . . .?" Ms. Lozoya: "Correct."); *id.*, Vol. III, at 590 (Tr.

Melissa Lozoya Dep., dated Mar. 18, 2019) (Counsel: "Did you rely on any

specific collision data from the City of Albuquerque to come to [your]

conclusion[s]?" Ms. Lozoya: "I did not.").

Indeed, when asked whether she could point to any connections between

accidents in Albuquerque and the conduct proscribed by subsections (B) through

(E) of the Ordinance, Ms. Lozoya answered in the negative:

[Counsel]: And can you point to any links between Albuquerque's high rate of accidents and people occupying medians? . . .

[Ms. Lozoya]: I can't.

[Counsel]: Can you point to any links between Albuquerque's high rate of accidents and people standing on on- and off-ramps? . . .

[Ms. Lozoya]: I can't.

[Counsel]: And can you point to any links between Albuquerque's . . . high rates of accidents between pedestrians and vehicles to physical exchanges between vehicle occupants and people in the travel lane? . . .

[Ms. Lozoya]: I have no information to base anything on.

*Id.*, Vol. III, at 592; *see also id.*, Vol. IV, at 854 (Tr. Melissa Lozoya Dep., dated Mar. 18, 2019) (indicating that Ms. Lozoya was not aware of "accidents that have occurred on medians because of somebody standing or sitting or just being on a median" or "accidents that have occurred because somebody is standing or sitting or being on a [freeway] on- or off-ramp").

As Plaintiffs' rebuttal expert, Dr. Ragland, noted in his report, while Ms. Lozoya's statements "contain[] high-level, theoretical opinions about roadway design and vehicle/pedestrian facility design generally," they "do[] not address . . . actual data reflecting vehicle-pedestrian conflicts in Albuquerque" and, therefore, only marginally bolster the City's claim that the Ordinance is necessary to address pedestrian safety concerns. *Id.*, Vol. I, at 228 (Expert Report of Dr.

47

David Ragland, dated Mar. 4, 2019).  Thus, while Ms. Lozoya's opinions could conceivably aid Albuquerque's city council as it considered and crafted ordinances addressing traffic safety issues generally, they shed little light on the central inquiry of our narrow tailoring analysis in these circumstances: whether the Ordinance alleviates real, non-speculative harms in a direct and material way, and avoids burdening substantially more speech than necessary in doing so?

Indeed, we conclude that Ms. Lozoya's testimony exposes, rather than bolsters, the lack of tailoring at the heart of the Ordinance.  That is, Ms. Lozoya's exposition on general design guidelines—which she admits is not informed by empirical data—does nothing to indicate whether the Ordinance is aimed at real and non-speculative harms—relating to pedestrian presence near ramps or on medians, or pedestrian interactions with vehicle occupants in travel lanes—or whether the Ordinance alleviates such harms in a direct and material way.  Yet Ms. Lozoya nonetheless recommends wide-ranging bans on pedestrian usage of entire categories of traditional public fora, predicated solely on theoretical safety concerns.

This "ends justify the means"-style thinking, decoupled from an accurate picture of the extant pedestrian safety problems the City actually faces—is anathema to the narrow tailoring required here, and resembles efficiency and ease-of-application arguments that the Supreme Court, and this court, have rejected before.  *Cf. e.g., McCullen*, 573 U.S. at 495 (noting that "the prime

48

objective of the First Amendment is not efficiency," and that, "[t]o meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier"); *McCraw*, 973 F.3d at 1077–78 (concluding that Oklahoma City's median ordinance was "not narrowly tailored to the problem it purport[ed] to address," and therefore "sacrificed [speech] for efficiency," by "tak[ing] 'the extreme step of closing a substantial portion of a traditional public forum to all speakers . . . without seriously addressing the problem through alternatives that leave the forum open for its time-honored purposes," which was a course of conduct that the city could not pursue "consistent with the First Amendment" (omission in original) (first quoting *Evans*, 944 F.3d at 856; and then quoting *McCullen*, 573 U.S. at 497)). Thus, Ms. Lozoya's generic and theoretical opinions do not aid the City's cause.

Indeed, in relying so heavily on Ms. Lozoya's abstract opinions concerning roadway design principles to assert that the Ordinance is narrowly tailored, the City sometimes verges on arguing—inadvertently or otherwise—that the areas regulated by the Ordinance are *not* public fora. That is, the City claims the Ordinance displays a permissible "fit between means and ends" because it "only targets pedestrian use of roadway features (such as travel lanes, freeway ramps and certain portions of medians) that put[] pedestrians in unsafe proximity to vehicle traffic," while leaving open to pedestrian use "other roadway features."

Aplt.'s Reply Br. at 8–9; *see also* Aplt.'s Opening Br. at 41 (arguing the

Ordinance is narrowly tailored because its scope is "limited . . . to only those

locations that are not designed to accommodate pedestrians and for which there is

objective evidence of safety concerns").[16]   In other words, in highlighting Ms.

_____

[16]    In other words, while couched in terms of "narrow tailoring," the City's invocation of Ms. Lozoya's opinions bears more directly on the *antecedent*—but uncontested—question of whether the areas regulated by the Ordinance are *themselves* public fora—that is, areas that, by their very character, are amenable to hosting expressive conduct.  As the City states, it aims to proscribe, not simply regulate or restrict, pedestrian presence in these areas because they are inherently dangerous—i.e., they are not designed to accommodate pedestrians for any sustained period.  *See* Aplt.'s Opening Br. at 1–2 (asserting that the Ordinance "furthers" the City's goals of "promot[ing] public safety" by "*prohibiting* . . . . pedestrians from standing in areas of roadways that are not designed to accommodate pedestrians and which pose a safety risk" and "*prohibit[ing]* . . . physical interactions between pedestrians and vehicle occupants when the vehicle is in a travel lane" (emphases added)); *cf.* Aplt.'s App., Vol. IV, at 1128 (Tr. Melissa Lozoya Dep., dated Mar. 18, 2019) (Ms. Lozoya opining that "medians should never be a place where people stand or sit" for longer than "[o]ne cycle length of a traffic signal"—and, even for that length, it would only be "reasonable or safe for people to be in medians" if they are "designed to accommodate someone standing there").  But this would seem to conflict with the very notion that these areas are traditional public fora—i.e., "places that by long tradition have been open to public assembly and debate," *Verlo*, 820 F.3d at 1129, and that the City has "immemorially . . . held in trust" for the public to use for such expressive purposes, *McCullen*, 573 U.S. at 476 (quoting *Summum*, 555 U.S. at 469).  *Cf. Cutting v. City of Portland*, 802 F.3d 79, 91 (1st Cir. 2015) (rejecting a city's claim "that it [was] obvious that all medians are unsafe" where the city "d[id] not contest that [its] median strips, as a group, are traditional public fora" and, thus, the city's "medians would seem to be—as a class—presumptively fit for the very activities that the [c]ity now contend[ed] are obviously dangerous").

Indeed, Appellees raise a similar point, claiming that, under its narrow tailoring argument, as viewed through the lens of Ms. Lozoya's design guidelines testimony, the City could "convert . . . paradigmatic public spaces into *nonpublic*

(continued...)

Lozoya's opinions, the City appears to argue that the Ordinance is narrowly tailored because "the specific areas" that it "cordon[s] off . . . are inherently dangerous locations for pedestrians—so dangerous in fact that restrictions on pedestrian presence and pedestrian activity are necessary to reduce and prevent the occurrence of injurious vehicle-pedestrian conflicts."  Aplt.'s App., Vol. I, at 230.

However, the City has given up the right on appeal to make this argument. As noted, the City has not challenged on appeal the district court's determination that the areas at issue here are traditional public fora.  And, having effectively agreed that these areas have this First Amendment status, the City "may not by its own *ipse dixit* destroy the . . . status."  *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 133 (1981); *see First Unitarian Church*,

---

[16](...continued)
fora through its design and landscaping choices," which would "flip[] the narrow-tailoring inquiry on its head."  Aplees.' Resp. Br. at 33–34; *see id.* at 3 ("Taken to their logical conclusion, the City's arguments would effectively allow the government to eliminate streets as traditional public fora simply by stating a subjective preference for vehicular traffic over speech by pedestrians."); *see also* Oral Arg. at 16:57–17:37 (conceding that, while it is not "mounting a forum analysis challenge" on appeal, "as it did in the district court," the City, "by invoking the[] design guidelines [relied on by Ms. Lozoya]," is "essentially" arguing that it can "altogether prohibit pedestrians from being in" "particular part[s] of the roadway," even if it "know[s]" and does not contest that such parts are "traditional public for[a]," so long as those parts are "not designed for pedestrians to stand in or . . . use [for] . . . physical exchanges"—and that the "impact" of this argument would be "essentially the same as allowing the City to de-designate a traditional public forum by government fiat").

308 F.3d at 1124 ("The government cannot simply declare the First Amendment status of property regardless of its nature and its public use."); *cf. Grace*, 461 U.S. at 180 (recognizing that the government may not "transform the character of the property by the expedient of including it within the statutory definition of what might be considered a non-public forum parcel of property"); *McCraw*, 973 F.3d at 1069 (concluding that, "[b]ecause the proximity, speed, and volume of passing cars does not deprive streets of their status as public fora, they similarly fail to strip medians of that status").

**ii**

Beyond Ms. Lozoya's expert opinions, the City cites, as "concrete evidence demonstrating the danger of standing in areas that are prohibited under the Ordinance," a series of accident reports it produced in response to Plaintiffs' discovery requests in the district court.  Aplt.'s Opening Br. at 40–41 (discussing "police reports that provided examples of pedestrians being harmed by vehicles while standing on medians and of vehicles driving onto medians," along with "evidence of unsafe situations, including collisions, resulting from physical interactions between pedestrians and motorists in travel lanes"); *see also* Aplt.'s App., Vol. I, at 227–28 (describing these accident reports as spanning a "four-plus-year timeframe" and as proffered in response to Plaintiffs' request for all documents relating to safety concerns the City considered when it adopted the Ordinance and pedestrian injuries caused by vehicle conflicts since 2014).

The City admits that it did not rely on these reports during the drafting of the Ordinance—and, more broadly, that it undertook little, if any, empirical or data-driven research prior to the Ordinance's passage.  *See, e.g.*, Aplt.'s App., Vol. III, at 582–83 (City of Albuquerque's Objs. & Resps. to Pls.' First Set of Reqs. for Admission, dated March 15, 2019) (admitting that the city council "did not examine" the accident reports produced to support the City's safety justification for the Ordinance, while contending the City "did examine events, facts, and circumstances analogous to those [accident reports]," including "personal accounts of pedestrian-vehicle collisions and/or near collisions from constituents, observations of safety concerns relating to pedestrian-vehicle conflicts by Albuquerque Police Department staff and by City Councilors themselves"); *id.* at 583–84 (admitting that the City did not "commission" studies examining ramp-, median-, or exchange-related safety hazards prior to the Ordinance's passage, but instead relied on "constituent concerns, independent observations of safety concerns relating to pedestrian-vehicle conflicts by Albuquerque Police Department staff, and by City Councilors themselves"). Nonetheless, the City avers these reports evince troubling public safety concerns that the Ordinance addresses.

But as the Plaintiffs' expert, Dr. David Ragland, explained in his expert report, the accident reports—to the contrary— actually *rebut* any inference of narrow tailoring and reveal that the Ordinance broadly restricts speech rights in

Albuquerque's public fora in service of alleviating largely non-existent, speculative harms.  *See* Aplt.'s App., Vol. I, at 228 (Dr. Ragland concluding that the "actual data"—as represented by the accident reports—"d[id] not support the City's position . . . that the challenged Ordinance is a needed public-safety measure"); *id*. at 229 (concluding that "[t]he median, ramp, and physical-interaction prohibitions in the Ordinance would therefore . . . likely . . . have a minimal impact on the overall vehicle-pedestrian conflicts identified in the [accident reports]").

In reaching his ultimate conclusions, Dr. Ragland reviewed and organized the 900 accident reports provided by the City, concluding that 606 of the 900 were "unique (i.e., non-duplicate) reports" and that "only 401" of the 900 "included some level of pedestrian involvement." *Id*. at 231.  Dr. Ragland "coded" these 401 pedestrian-involved reports "for multiple variables, such as lighting conditions, pedestrian injury, vehicle-occupant injury, relationship to an activity prohibited by the Ordinance, and contributing factors identified by the reporting officer in the Collision Reports (such as 'Driver Inattention[,]' 'Alcohol[,]' and 'Pedestrian Error')." *Id*.

Dr. Ragland's analysis of the data revealed that "[o]ver 50% (203 of 401)" of the relevant accident reports "involved a vehicle colliding with a pedestrian who was making a lawful street crossing (such as walking in a crosswalk, or walking with the traffic light, for example)"—i.e., "proper pedestrian behavior"

54

that is not proscribed by the Ordinance. *Id.* at 232 (emphasis omitted).

Moreover, roughly "43% (173 of 401) of the reports involved pedestrians who

engaged in conduct—such as jaywalking or darting into the road—not addressed

by the Ordinance's median restrictions, ramp restrictions, or prohibitions on

physical interactions/exchanges between pedestrians and vehicle occupants"—i.e.,

conduct that, while unlawful, does not fall within the Ordinance's ambit. *Id.*

Thus, "[o]nly approximately 6% (*25* of 401) of" the accident reports related

to "behavior specific to the median, ramp, and physical interaction restrictions in

the Ordinance"—or, stated differently, "nearly 94% (376 of 401)" of the relevant

reports "involved [either] lawful behaviors or behaviors that the Ordinance's

median restrictions, ramp restrictions, and physical-exchange restrictions do not

address." *Id.* at 233 (emphasis added); *see also id.* at 233 & nn.16–17 (explaining

that accident reports involving pedestrian presence near highway ramps did not

indicate whether the pedestrian was within six feet of the ramp, and that accident

reports involving pedestrian presence on medians did not indicate the width,

location, or landscaping status of the particular median, such that Dr. Ragland's

categorization of the 25 accident reports as involving pedestrian conduct

proscribed by the Ordinance "may be over-inclusive, and include pedestrians that

are in locations that the City itself may deem suitable for pedestrians under"

subsections (B) and (C) of the Ordinance).

Additionally, Dr. Ragland's "further analysis of these 25 reports indicate[d] that most of the[m] . . . involve[d] circumstances such as substance abuse, mental illness, or driver error, and many did not involve conduct that would violate" subsections (B) through (E) of the Ordinance. *Id*.; *see also id*. at 233–35 (summarizing the scenarios described in each accident report, which included, *inter alia*, (1) "[a] vehicle driver who reported being shot at by the driver of another vehicle"; (2) "[a] pedestrian who was struck by a vehicle" during a potential domestic dispute; (3) a pedestrian who ran into an intersection screaming and jumped onto a vehicle; and (4) various instances of intoxicated, mentally ill, or simply disoriented pedestrians who sustained injuries from stepping into oncoming traffic). In Dr. Ragland's estimate, "only four (4) [accident reports] clearly involved someone standing on a median or ramp, not otherwise likely violating an existing law"—and *none* "involved fatalities"—indicating an "extraordinary low accident rate" given the "likely hundreds of millions of instances of vehicles driving by persons in these locations" over the timeframe of the reports. *Id*. at 236.

The reports also indicated the rate of pedestrian injuries and fatalities was quite low: "28% (112 of 401)" of the relevant reports involved "no pedestrian injury," while "23% (94 of 401) exhibited the lowest injury rating, complaint of pain," such that "over 51% (206 of 401) of the vehicle-pedestrian conflicts identified by the City [in the reports] resulted in either no or minor pedestrian

56

injury." *Id*. (emphasis omitted). Of the 401 relevant accident reports, "fewer than 4% (15 of 401)" involved a pedestrian fatality—and a "further analysis of these 15 reports indicate[d] that most of these [fatality] incidents involved pedestrians who attempted to make illegal road crossings (such as jaywalking, crossing against the light, etc.)." *Id*.; *see also id*. at 236–37 (explaining that the reports "include[d] pedestrians who were struck by vehicles" when, *inter alia*, "jaywalking"; walking "against the light"; or walking outside the crosswalk). And injuries to vehicle occupants were even less common: more than 85% of the 401 relevant accident reports involved no vehicle occupant injury, 7.5% involved only minor injuries, and less than 3% of reports (11 of 401) "involved more significant injuries (with no reported fatalities)." *Id*. at 237–38. Viewed alongside Dr. Ragland's expert analysis, then, the accident reports do not support—and, indeed, *rebut*—the City's position that "the Ordinance is needed in order to reduce the incidence of vehicle-pedestrian conflicts." *Id*. at 230.

The City, for its part, pushes back on this conclusion—but only weakly so. *See, e.g.*, Aplt.'s Opening Br. at 18 & n.76, 19–22 (generically complaining about district court's denial of its motion to exclude Dr. Ragland as untimely disclosed without adequately challenging this denial on appeal, as well as noting that Dr. Ragland often agreed with Ms. Lozoya's opinions concerning theoretical traffic safety guidelines). Specifically, the City's most substantive objection is that the district court improperly resolved disputed inferences from Dr. Ragland's analysis

in Plaintiffs' favor. *See, e.g.*, Aplt.'s Reply Br. at 29–30 ("emphatically disput[ing] the accuracy of Dr. Ragland's report" based on, *inter alia*, the limited number of accident reports produced, the fact that the reports that were produced "could not possibly include every accident or near-accident involving pedestrians engaging in the conduct limited by the Ordinance," and Dr. Ragland's "acknowledg[ment] that it was possible that his team missed accident reports that included conduct that was prohibited by the Ordinance"). We, of course, review the record de novo, so even if the district court had improperly resolved disputed facts or factual inferences—and we offer no opinion on this matter—that would not invariably require remand, much less reversal outright. *See supra* note 11.

More particularly, the City's attempt to cast doubt on Dr. Ragland's conclusions based on the data *it* produced to support the Ordinance is unconvincing. If the City has further "concrete data" supporting the necessity of the Ordinance's restrictions, then it should have presented that data to the district court. *The City*, not Plaintiffs, bears the burden of establishing the relevant provisions of the Ordinance are narrowly tailored, and it cannot bear that burden by positing, on the one hand, that its own evidence is too incomplete or unreliable to allow for reliable analysis, yet on the other hand, that the evidence is robust enough to carry its legal burden. *Cf.* Aplt.'s App., Vol. V, at 1268–72 (Pls.' Br. Regarding the Rebuttal Expert Report of Dr. David Ragland, filed June 7, 2019) (arguing that the "City's criticism of its own data set and data collection," along

58

with its "speculation" about "additional data regarding 'close calls'" that "may not even exist" provides "no reason to doubt the reliability of Dr. Ragland's opinions, or to think that the Ordinance passes constitutional muster," especially given "that the City has the burden of showing that the law is . . . narrowly tailored to . . . addressing a significant . . . government interest"); *cf. also Doe*, 667 F.3d at 1133–34 (holding that a city failed to show its ban on registered sex offenders in public libraries was narrowly tailored where the city "did not present any evidence" and "provided nothing in the record" showing such tailoring). Stated otherwise, the City cannot render these accident reports more probative of real harms arising from pedestrian presence in the areas that the Ordinance covers through sheer speculation—especially concerning the quality or completeness of the evidence that it itself produced. And, more generally, these reports do not aid the City's efforts to show that the Ordinance's restrictions are adequately tailored to advance real and non-speculative government interests.

### iii

Lastly, the City cites general statistical information, primarily compiled in the Ordinance's preamble, along with anecdotes from city councilors, police officers, and constituents, as evincing both the existence of real or anticipated harms arising from pedestrian presence in the areas addressed by the Ordinance and the concomitant need for the Ordinance's restrictions to remedy those harms.

59

*See* Aplt.'s Opening Br. at 41. But these statistics and anecdotes are simply too generic or isolated to offer support for the notion that the Ordinance "serve[s] a substantial state interest in a direct and effective way" and, more specifically, that the City's "recited harms are real," or "that the [Ordinance] will in fact alleviate" any identified interests or harms "in a direct and material way." *Citizens for Peace in Space*, 477 F.3d at 1220–21 (first alteration in original) (first quoting *Edenfield*, 507 U.S. at 773; and then quoting *Turner*, 512 U.S. at 664).

**(A)**

The Ordinance's preamble recites a variety of general traffic statistics the City contends justify the Ordinance's restrictions. *See* Aplt.'s App., Vol. I, at 81–83. Among other things, these statistics indicate that, nationally, "more than 4,000 pedestrians die and 70,000 get injured by encounters with vehicle traffic annually," and that Albuquerque, and New Mexico more generally, have particularly extreme rates of pedestrian fatalities. *Id*. at 81. More specifically, the preamble references a University of New Mexico Study commissioned by the City in 2015 "to study the occurrences and possible causes of pedestrian and bicyclist involved crashes in Albuquerque." *Id*.; *see generally id*., Vol. I, at 88–158 (Pedestrian & Bicycle-Involved Crash Analysis & Safety Performance Enhancement at High-Traffic Intersections ("UNM Study"), dated Jan. 2016). The Study, according to the preamble, "revealed that among the 10 intersections in the City with the highest number of pedestrian injuries and fatalities,

60

pedestrian error and driver inattention were frequently among the top contributing factors"—and that, at those intersections, the Study identifies as a "contributing factor" the "existence of pedestrians entering traffic outside of crosswalks for such purposes as interacting with motorists to solicit donations." *Id*. at 82; *see also id*. (reciting, generally, that interactions between pedestrians on medians and motorists "foster scenarios for greater driver distraction and pedestrian-vehicle conflicts"). The preamble goes on to state that, "absent special safety accommodations specifically for pedestrians such as pedestrian refuges, roadway medians are not designed for use by pedestrians"; moreover, national guidelines "recommend a minimum median width of 6 feet," with a preference for a width of 8-to-10 feet, for medians "contemplated to accommodate a pedestrian-refuge from traffic." *Id*. at 82–83; *see also id*. at 83 (listing "potential physical, capital improvements" that the UNM Study recommends to "help improve intersection safety").

These statistics are of limited value, however. Broadly speaking, the injury and fatality numbers recited in the preamble, on their face, do not specify how many of these injuries or deaths—if any—were related to pedestrian presence near ramps or on medians, or to exchanges between pedestrians and vehicle occupants in Albuquerque. Nor has the City included evidence in the record further elucidating such generic numbers.

Quite the contrary, in fact: various portions of the record—such as the deposition testimony of one-time city council president Ken Sanchez, excerpted below—suggest a lack of understanding by at least some of the city councilors as to whether the statistics bore on traffic and safety problems in Albuquerque *related* to ramps, medians, and physical exchanges:

> [Counsel]: Did you personally review any studies by the National Highway Traffic Safety Administration in considering this ordinance?
>
> [Mr. Sanchez]: No. . . .
>
> [Counsel]: Do you know what percentage of [the] 4,000 pedestrian fatalities [referenced in the Ordinance's preamble] relate to pedestrians standing in medians?
>
> [Mr. Sanchez]: No.
>
> [Counsel]: Do you know what percentage of those 4,000 fatalities relate to pedestrian interactions with vehicles from roadsides?
>
> [Mr. Sanchez]: No.
>
> [Counsel]: Do you know what percentage . . . of the 70,000 injuries [referenced in the Ordinance's preamble] relate to pedestrians standing in medians?
>
> [Mr. Sanchez]: No.
>
> [Counsel]: Do you know what percentage of the 70,000 injuries relate to pedestrians interacting with vehicles from roadsides?
>
> [Mr. Sanchez]: No. . . .
>
> [Counsel]: Do you know what percentage of [New Mexico's pedestrian] fatalities relate to pedestrians standing in medians?

[Mr. Sanchez]: No.

[Counsel]: Do you know what percentage of those fatalities relate to pedestrians interacting with vehicles from roadsides?

[Mr. Sanchez]: No. . . .

[Counsel]: And with respect to [the] data [relating to Albuquerque's pedestrian fatalities], do you know what percentage of those fatalities relate to pedestrians standing in medians?

[Mr. Sanchez]: No.

[Counsel]: Do you know what percentage of those fatalities relate to pedestrians interacting with vehicle occupants from a roadside?

[Mr. Sanchez]: No.

*Id.*, Vol. II, at 414 (Tr. Ken Sanchez Dep., dated Sept. 12, 2018); *see also id*. at 415–16.

Indeed, the UNM Study, which was "one of the [City's] principal bases of evidentiary support" for the Ordinance, *id*., Vol. II, at 441 (Tr. Chris Melendrez Dep., dated Jan. 30, 2019), is largely beside the point, as it includes virtually no data relevant to subsection (B) through (E)'s restrictions, *see* Aplees.' Resp. Br. at 29, 32, 39–40 (asserting that (1) regarding subsection (B), "[t]he UNM Study . . . did not analyze highway exit or entrance ramps at all"; (2) regarding subsection (C), "[t]he UNM Study . . . did not identify a single accident involving a pedestrian simply standing on a median"; and (3) regarding subsections (D) & (E), "the UNM Study does not identify a single accident or injury caused by

physical exchanges between pedestrians and motorists"—and, what's more, "the only physical interaction the Study affirmatively identifies as a factor contributing to crashes—'catching a connected bus'—is *expressly exempt* from the Ordinance's prohibitions" (quoting Aplt.'s App., Vol. III, at 640–41)); *see also* Aplt.'s App., Vol. III, at 583 (City: admitting that "none of the ten intersections identified in" the UNM Study are located at a highway exit or entrance ramp, as described in subsection (B) of the Ordinance); *id.*, Vol. II, at 438 (the City's Rule 30(b)(6) deponent testifying that (1) none of the intersections discussed in the UNM Study are "located at an entrance or exit ramp"; (2) the Study does not "mention entrance or exit ramps even once"; (3) the Study does not "report any examples of people standing on medians being hit by vehicles"; and (4) the Study does not "talk about people on on-ramps being hit by any vehicles"); *cf. id.*, Vol. III, at 640–41, 643–45 (UNM Study) (discussing pedestrian solicitation of donations from motorists in the context of roadway accidents, but failing to specify whether this solicitation involved the "physical exchanges" proscribed by subsections (D) and (E) of the Ordinance and, furthermore, opining that such accidents could be reduced not by banning all such exchanges or solicitation attempts, but rather by, *inter alia*, increasing crosswalk times, installing median barriers, and strategically placing warning signs).

The statistical evidence the City relies on, then, is not sufficiently particularized to the interests the City claims the Ordinance directly addresses,

64

and, therefore, does little to show that the Ordinance—as a means of addressing those interests—is narrowly tailored.

**(B)**

The City's anecdotal evidence fares no better.  As with the statistical evidence discussed above, the anecdotes the City cites either are too generic to support the Ordinance's restrictions, or involve incidents where the nexus between the injuries described and the conduct that the Ordinance proscribes is simply too tenuous to bolster any conclusion that the City narrowly tailored the Ordinance to address real, non-speculative harms or to alleviate such harms in a direct and material way.  *See* Aplt.'s Opening Br. at 41 (claiming that the City, in "enacting the Ordinance, . . . relied on . . . the observations of the Albuquerque Police Department and its officers' safety concerns for pedestrians standing on medians and for unsafe pedestrian-vehicle interactions" and "City Councilors' and their constituents' own observations and experiences regarding pedestrian safety in these areas," but citing in support of this claim only two excerpts from the deposition of the City's Senior Policy Analyst, Chris Melendrez); Aplt.'s App., Vol. IV, at 1107–13 (Tr. Chris Melendrez Dep., dated Jan. 30, 2019) (generically discussing traffic safety issues in Albuquerque; relating vague, second-hand accounts of pedestrian-vehicle conflicts; or recounting others' descriptions of incidents involving pedestrians "r[unning] in front of . . . car[s]"); *see also id.*, Vol. II, at 400 (Tr. Trudy Jones Dep., dated Jan. 31, 2019) (testifying that she did

not need empirical data to demonstrate the necessity of the Ordinance because she felt it was adequately justified by "good common sense").

Indeed, in many respects the situations described by the anecdotes are largely divorced from the central thrust of the Ordinance—which is to ameliorate the purported harms caused by pedestrian presence near ramps and on medians, or pedestrian involvement in physical exchanges with vehicle occupants. *Cf.* Aplees.' Resp. Br. at 33 (arguing, with regard to subsection (C), that "[t]he City's anecdotal evidence . . . focuse[s] on conduct entirely outside the scope of" the median regulation or lacks the requisite modicum of detail to adequately support the necessity of this regulation); Aplt.'s App., Vol. II, at 402 (Tr. Trudy Jones Dep., dated Jan. 31, 2019) (city councilor, Trudy Jones, initially claiming, generally, that she had seen "[d]ozens" of pedestrians fall off medians but, when pressed for details, being able to describe only one, six-month-old incident involving an individual crossing the street and tripping when he reached the median, while additionally testifying that she could not recall any panhandlers standing on medians who had fallen off); *id*. at 415 (Tr. Ken Sanchez Dep., dated Sept. 12, 2018) (when asked what "personal experiences . . . inform[ed his] view that pedestrians . . . within . . . street medians can distract drivers," describing an "occurrence" relating to solicitation of donations where an individual "on the sidewalk . . . picked up [a] bat" and damaged a vehicle near him).

Thus, as with its statistical evidence, the City's anecdotal evidence simply misses the mark. While these statistics and anecdotes—like the accident reports and Ms. Lozoya's opinions discussed above—might be relevant factors in an overarching policymaking process by Albuquerque's city council, they have little bearing, in *this* case, on the question of whether the Ordinance is narrowly tailored to achieving significant government interests that are real and not speculative.

**b**

In light of the paucity of evidence proffered by the City showing that "the harms or the remedial effects of" the Ordinance "are supported" by more than "speculation [and] conjecture," the Ordinance's breadth merely reinforces our ultimate conclusion that the Ordinance "burdens substantially more speech than is necessary to further [the City's] legitimate interests" and is, therefore, not narrowly tailored. *McCraw*, 973 F.3d at 1071; *see id*. at 1073–74 (noting that, "[f]or a regulation to be narrowly tailored, it must not only promote 'a substantial government interest,' but that interest must 'be achieved less effectively absent the regulation, *and* . . . not burden substantially more speech than is necessary to further the government's legitimate interests,'" and that a government's failure to present "evidence of concrete harm arising from" the activities it seeks to restrict

67

"infects our analysis of both the 'ends' and the 'means'" chosen by the government (omission in original) (emphasis added) (quoting *Verlo*, 820 F.3d at 1134)).

By their plain terms, subsections (B) through (E) of the Ordinance sweep broadly and substantially burden private speech, "prohibit[ing] *all* expressive activity in a wide variety of spaces where Albuquerque's citizens have historically . . . exercised their" First Amendment rights.  Aplees.' Resp. Br. at 2. Subsection (B) erects a six-foot buffer zone around all of Albuquerque's highway entrance and exit ramps, subject only to limited exceptions.  The City concedes there are no ramps in Albuquerque that fall outside Subsection (B)'s ambit.  *See* Aplt.'s Opening Br. at 49 (acknowledging that the City "did not select certain controlled access roadways to be included in the Ordinance," but rather "*included all three of them*" (emphasis added)).  Likewise, subsections (D) and (E) bar all exchanges between pedestrians and vehicle occupants where the vehicle is in a travel lane or at an intersection, absent extenuating circumstances; the subsections "contain[] no geographic or temporal limitations" and "appl[y] through Albuquerque's 190 square miles, in any neighborhood, at any time of day and no matter the traffic volume."  Aplees.' Resp. Br. at 10.  As well, Subsection (C)—the median regulation—proscribes expressive conduct across numerous categories of medians throughout the City.

Thus, the Ordinance's text alone makes clear that numerous public fora throughout Albuquerque are effectively rendered off-limits for speech and expressive conduct through these regulations. *Cf. Edenfield*, 507 U.S. at 777 ("Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963))); *cf. also McCullen*, 573 U.S. at 492 (noting the "First Amendment virtues of targeted injunctions[,] as alternatives to broad, prophylactic measures"). While the City objects to this characterization, its objections are unpersuasive. Broadly, the City claims the Ordinance "does not impose a substantial burden on speech because it has a limited application," but what the City *means* by "limited application" is telling. Aplt.'s Opening Br. at 38. That is, the City contends the Ordinance's application is "limited" because it "applies only to locations within the roadway that are: (1) not designed for pedestrian use or for pedestrian-vehicle interactions, and (2) in close proximity to high-speed and high-volume traffic." *Id*. at 38–39.

However, the City is not permitted to claim the Ordinance has a limited ambit or imposes a light burden on First Amendment rights by effectively "downgrading" the public fora it restricts through the invocation of roadway design guidelines. *First Unitarian Church*, 308 F.3d at 1129 n.11 ("The Supreme Court has made clear that once an 'archetype' of a public forum has been identified, it is not appropriate to examine whether special circumstances would

69

support downgrading the property to a less protected forum."). Nor can the City

narrow the Ordinance's scope by observing that its restrictions leave "[o]ther

portions of the roadway that are either designed for pedestrian use or which

provide a greater refuge from the dangers of high-speed traffic . . . available for

speech activities," as this argument effectively conflates the narrow tailoring

inquiry with an *alternative channels* analysis. *See, e.g.*, *iMatter Utah*, 774 F.3d at

1267 ("[The government] contends that if a regulation leaves open ample

alternative forums for communication, then that regulation is narrowly tailored.

The district court rejected [this] position, concluding that it 'improperly conflated

the government's need to narrowly tailor its regulations with its need to

demonstrate ample alternatives for free speech.' 'Even if ample alternatives for

speech exist,' the district court explained, 'the [government] cannot simply

prohibit a group from speaking in a traditional public forum without

demonstrating how the [government's] restriction on speech is narrowly tailored

to serve a significant interest.' We agree. Although a narrowly tailored

regulation may tend to leave open ample alternatives for communication, there is

no basis for substituting one requirement for the other." (citations omitted)

(quoting *iMatter Utah v. Njord*, 980 F. Supp. 2d 1356, 1372 (D. Utah 2013)));

*Cutting v. City of Portland*, 802 F.3d 79, 88 (1st Cir. 2015) (noting that "the fact

that there are other places where plaintiffs may engage in their expressive activity

'misses the point'" of the narrow tailoring inquiry, and a "flat ban on speech in a

70

particular forum . . . can fail narrow tailoring even if it leaves open other channels for plaintiffs to engage in their expressive activity" (quoting *McCullen*, 573 U.S. at 489)).

Beyond these arguments, the City also specifically asserts that subsection (C) is sufficiently tailored in scope to pass constitutional muster because it "would apply [only] to 20% of the roadways in Albuquerque." Aplt.'s Opening Br. at 53; *see* Aplt.'s Reply Br. at 14; *see also* Aplt.'s App., Vol. IV, at 1135–36 (Ms. Lozoya testifying that "20 percent" of Albuquerque's "4600 lane miles of [city] roadway" would be subject to the Ordinance's prohibitions). But this roadway estimation tells us little about how many of Albuquerque's *medians* come under subsection (C)'s restrictions, and the City itself concedes that it never specifically counted how many medians would be covered by the median regulation. *See* Aplt.'s Opening Br. at 53 (admitting that the City "did not provide a precise figure for the number of medians affected" to the district court); Aplt.'s Reply Br. at 14 ("Plaintiffs are correct that the City never did a median-by-median count to determine how many would come within the scope of the Ordinance.").

More broadly, testimony from Albuquerque's Senior Policy Analyst, Chris Melendrez, indicates that the City's efforts to measure the median regulation's overall breadth were cursory at best:

71

[Counsel]: Did [the City] undertake any analysis to determine how many medians would be available to people who wanted to solicit donations?

[Mr. Melendrez]: Only in the sense that we reviewed the map of the city and which roadways would be impacted.  And it was easy to identify large swaths of the city that wouldn't be impacted.

[Counsel]: Do you know about how many medians would still be available that wouldn't be impacted by the ordinance?

[Mr. Melendrez]: We didn't—I never did a numeric count.

[Counsel]: Did you ever ask for data or information from another City department on how many medians would be left open for individuals soliciting donations?

[Mr. Melendrez]: No. . . .

[Counsel]: Did you or any other policy analyst or anyone else working on the ordinance [conduct observational activities to assess the number of unaffected medians]?

[Mr. Melendrez]: You know, I don't know that we went out and did, like, a data gather, you know, a visual survey of where people are standing or anything like that.

Aplt.'s App., Vol. III, at 815 (Tr. Chris Melendrez Dep., dated Jan. 30, 2019).

Moreover, Ms. Lozoya's testimony with regard to subsection (C)(2), which restricts pedestrians from being present on landscaped medians, reinforces the breadth of subsection (C)'s median regulation because she testified that the City's policy "is to landscape most medians as long as they are about 10 to 12 feet in width or wider." *Id.*, Vol. III, at 589.  And last, but not necessarily least on the breadth scale, subsection (C)(3) would appear to vest near-unbridled discretion in

72

the "City Traffic Engineer" to deem specific medians unsafe and, consequently, bar pedestrians from using them.   *See id*., Vol. VI, at 1440 (allowing the City Traffic Engineer to "identif[y] by signage as not suitable for pedestrian use" any median in Albuquerque "based on identifiable safety standards" or "objectively unsuitable features").

Thus, the median regulation could conceivably leave virtually *no* medians available to Albuquerque residents for speech or expressive conduct.  More to the point, the City has failed to provide us with concrete, adequate evidence that would permit us to draw contrary inferences.

**c**

In contending that the Ordinance is narrowly tailored, and that it has proffered sufficient evidence of such tailoring, the City relies almost exclusively on our decision in *Evans v. Sandy City*.  *See* Aplt.'s Reply Br. at 3 ("Ultimately, this appeal requires the Court to decide how *Evans* applies to the facts of this case.").  The City asserts that its approach—i.e., "limit[ing] the Ordinance's application to only those locations that are not designed to accommodate pedestrians and for which there is objective evidence of safety concerns"—is "exactly in line with, and arguably more comprehensive, than what Sandy City did in *Evans*."  Aplt.'s Opening Br. at 41; *see also* Aplt.'s Suppl. Br. at 4 (claiming the City "produced more comprehensive evidence in support of" its interest in reducing pedestrian-vehicle conflicts "than Sandy City produced in

73

*Evans*" and emphasizing that "the Ordinance was created in the context of a severe pedestrian safety problem," which "created a heightened incentive for the City to reduce pedestrian-vehicle conflicts through a variety of measures").

As well, the City argues that the evidence it has proffered to support the Ordinance is comparable to, and even more substantial than, the evidence presented in *Evans*. *See id*. at 42 (comparing the City's reliance on "observations of [Albuquerque police officers]," "traffic engineering principles, nationally accepted traffic design guides, pedestrian fatalities statistics, the observations of the City Councilors and of their constituents, and . . . police reports" to our determination in *Evans* that "subjective observations of a police captain and prosecutor regarding the dangerousness of medians were sufficient to show that the ordinance" at issue was narrowly tailored).

By brushing off its evidence, says the City, the district court "imposed a much higher [narrow tailoring] burden" than the one we explicated in *Evans*, which consequently warrants reversal in this case. *Id.* at 45. But *Evans* is not the panacea that the City believes it to be. To start, that case's facts are plainly distinguishable. Briefly, in *Evans* we considered whether Sandy City, Utah's ordinance—which prohibited persons from sitting or standing on unpaved medians or medians less than three feet wide—was narrowly tailored. *See Evans*, 944 F.3d at 851–52. We ultimately concluded that the ordinance was narrowly tailored for several reasons. Among these reasons, we concluded that the

74

ordinance did not impose a substantial burden on the plaintiff's speech. While the *Evans* plaintiff had "received two citations for standing on a paved 17-inch median," it was uncontested that "[a] mere ten feet away from where he was cited, the median [in question was] wider than 36 inches and [was] therefore unaffected by the [o]rdinance"—and we "simply [could not] accept th[at] ten-foot difference *on the same median* as a substantial burden on speech." *Id*. at 857.

As well, we held a "direct relationship exist[ed] between the City's goal of promoting public safety and the restriction on speech it selected." *Id*. at 858. Sandy City's police captain, "a[n] . . . official who had years of experience dealing with unsafe situations involving pedestrians on medians[,] . . . conducted a survey of the medians" in the city; based on these observations, "the [c]ity drafted the [o]rdinance limiting it only to those medians where it would be dangerous to sit or stand at any time of day, at any traffic speed or volume." *Id*. The city's prosecutor, who had also surveyed the medians, explained that unpaved medians were included because of the "tripping hazard" they presented. *Id*. We found such evidence "sufficient to satisfy the [c]ity's burden to show the [o]rdinance" was narrowly tailored. *Id*.; *see id*. ("The [o]rdinance only prohibits sitting or standing on narrow or unpaved medians where it would be dangerous to do so. This is the sort of close fit the narrow tailoring requires."). Additionally, we rejected the plaintiff's argument that the city "failed to satisfy its evidentiary burden because it did not provide accident reports or complaints regarding

75

medians in all parts of the [c]ity," holding that the city was "not require[d] . . . to wait for accidents to justify safety regulations." *Id*.

The City's Ordinance at issue here is plainly more burdensome and less tailored than the one at issue in *Evans*—even putting aside the fact that the City's Ordinance targets more categories of fora and types of conduct than did the ordinance in *Evans*. The relevant regulation for comparison with *Evans*—subsection (C)'s median regulation—is substantially broader in scope than was the regulation in *Evans*. In *Evans*, Sandy City prohibited persons from standing or sitting on medians slimmer than three feet, and on unpaved medians that presented tripping hazards. Here, Albuquerque sets its minimum width requirement at six feet—double the width in Sandy City's ban—provided such a median is in a roadway with a speed limit of thirty miles per hour or higher, or is within twenty-feet feet of an intersection with such a roadway. Moreover, Albuquerque also bars pedestrians from being present on all landscaped medians, and it delegates broad, largely unchecked power to a City official to deem medians "unsafe" and concomitantly cordon them off from pedestrian usage.

More significantly, the City points to no evidence indicating how many medians are covered by the restrictions in subsection (C); indeed, while the City claims this subsection is narrowly tailored because it, conceivably, applies only to those *portions* of medians that the City has deemed unsafe, rather than entire medians, *see* Aplt.'s Reply Br. at 14–16; Aplts.' Suppl. Br. at 10–11, the City

76

cites no evidence in the record that large portions of regulated medians are left open to expressive conduct—and it offers nothing resembling the uncontested fact in *Evans* that the plaintiff could simply move ten feet down the same median and continue his conduct, which (as Plaintiffs correctly assert) was "central" to our reasoning in that case, *see* Aplees.' Resp. Br. at 43–44 (arguing the contrast with *Evans* "could not be more stark" because, unlike in *Evans*, where the plaintiff's ability to avail himself of the same median was "central" to our narrow tailoring finding, in this case, "speakers in Albuquerque do not enjoy the freedom to move" to "another median—much less ten feet down the same median"—or to "a virtually identical location to engage in the same speech," as the City has barred pedestrians from "*all* entrance and exit ramps" and "*all* medians that are commonly used for communication," along with barring qualifying physical exchanges "in *every street* in *every part of the City*").

Indeed, any attempt by the City to create a favorable comparison between the scope of the Ordinance here and the scope of the ordinance in *Evans* is largely undercut by the fact—established by Ms. Lozoya's testimony—that the landscaping restriction in subsection (C)(2) likely sweeps in most of Albuquerque's widest medians.  *See* Aplt.'s App., Vol. III, at 589 (testifying that the City's policy "is to landscape most medians as long as they are about 10 to 12 feet in width or wider").  And unlike Albuquerque's Ordinance, Sandy City's ordinance had no provision allowing for a municipal officer to deem medians

unsafe based on undefined "safety standards." Thus, the City cannot argue that the Ordinance's median regulation imposes only a slight burden based on a comparison with the regulation at issue in *Evans*.

Yet, more particularly, the City also argues that subsection (C)(2), by itself, is a lawful regulation, given that we upheld Sandy City's similar prohibition on persons standing or sitting on "unpaved medians" in *Evans*. *See* Aplt.'s Reply Br. at 17 (claiming that subsection (C)(2) is "clearly narrowly tailored under *Evans*," and that the City need not present "evidence of 'accidents or incidents stemming from pedestrian presence in the landscaped areas of medians'" because "the First Amendment 'does not require [it] to wait for accidents to justify safety regulations'" (first quoting Aplees.' Resp. Br. at 36; and then quoting *Evans*, 944 F.3d at 858)). But this argument fails for numerous reasons.

At the outset, the City cannot justify this particular provision simply by citing to *Evans*; rather, it is required to come forward with some evidence demonstrating that the provision ameliorates real, not speculative, harms, in a direct and material way. *Cf. Doe*, 667 F.3d at 1133–34 (rejecting a city's bare citation to "other cases in which courts have found challenged restrictions" like the one at issue "to be narrowly tailored" because the question of "whether the restrictions at issue in those cases were narrowly tailored in the respective contexts of those cases d[id] not compel any conclusion as to the [c]ity's ban in this case," and stating more broadly that "[g]eneral reference to other cases

78

involving other cities, other restrictions, other interests to be served, and other constitutional challenges do not relieve" the city of its narrow tailoring obligation "in this case"). Nor is it clear that subsection (C)(2) is readily analogous to the "unpaved median" provision in *Evans*, at least not without further factual elaboration on the contours of that subsection by the City. This is especially true given that the scope of subsection (C)(2) seems much broader than that of the regulation in *Evans*, in light of Ms. Lozoya's testimony on the breadth of the City's landscaping policy. *See* Aplt.'s App., Vol. III, at 589.

More to the point, the City has presented no anecdotes or data indicating the existence of a real or concrete safety issue arising from pedestrian presence on landscaped medians. By contrast, in justifying its "unpaved medians" restriction, Sandy City presented testimony from its police captain that "sitting or standing on . . . unpaved medians [was] a public safety hazard" in light of "several close calls" between pedestrians and vehicles that could have led to "devastating" accidents. *Evans*, 944 F.3d 854; *cf. id.* (noting that the city's prosecutor was notified by police of "safety issues" relating to people "falling into traffic"). Moreover, Sandy City "further confirmed" its "public safety justification" through the drafting procedure employed by its prosecutor, who "gathered information by surveying the [c]ity's medians" and subsequently concluded that "unpaved medians, which were typically covered in rocks, boulders, and in some cases shrubs, were dangerous because pedestrians could easily lose their footing

79

or trip on uneven surfaces." *Id.* at 854–55; *see id.* at 858 ("The [c]ity prosecutor explained he included unpaved medians where the 'footing isn't uniform,' which posed a tripping hazard."). Thus, we concluded that such evidence was "sufficient to satisfy" the city's narrow tailoring burden. *See id.* at 858. We have no such evidentiary showing here.

To be sure, Albuquerque counters that, under *Evans*, it need not present much, if any, evidence in support of this subsection. Rather, it reasons that it can simply rely on its own common sense and a desire to proactively prevent accidents before they occur. *See* Aplt.'s Reply Br. at 17 ("Plaintiffs attack [subsection (C)(2)] as lacking evidence of 'accidents or incidents stemming from pedestrian presence in the landscaped areas of medians.' But, such evidence is not necessary; the First Amendment 'does not require the government to wait for accidents to justify safety regulations.'" (first quoting Aplees.' Resp. Br. at 36; and then quoting *Evans*, 944 F.3d at 858). True, we have recognized that the government may act proactively, *see Evans*, 944 F.3d at 858—and that, more broadly, the government is "permitted . . . to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even . . . based solely on history, consensus, and 'simple common sense,'" and it need not proffer either "empirical data . . . accompanied by a surfeit of background information" or a "double-blind empirical study[ ] or a linear regression analysis" to bear its First Amendment burden, *Aptive*, 959 F.3d at 989,

992 n.11 (first quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001);

and then quoting *Luce v. Town of Campbell*, 872 F.3d 512, 517 (7th Cir. 2017)).

But "the City's prerogative to determine how to support a regulation does

not extinguish its burden to 'show that its recited harms are real,'" *McCraw*, 973

F.3d at 1073 (quoting *Citizens for Peace in Space*, 477 F.3d at 1221)—and here,

not only has the City put forward inadequate evidence of real, non-speculative

harms arising from pedestrian presence on landscaped medians, but, more

significantly, the evidence it *has* put forward *belies* any notion that the City, in

reality, faces such harms.  Most prominently, the City points to *not one* accident

report among the 900 it produced that relates to some kind of pedestrian accident

or danger involving a landscaped median, and it cites to nothing else in the record

bolstering the idea that its common-sense rationale for this particular provision is

grounded in anything more than speculation.  In other words, while we approved

of Sandy City's use of common sense and anecdotes to justify its regulation in

*Evans*, what was absent there—and *present* here—is concrete data that undercuts

such anecdotal and common sense evidence.  *Cf. id.* at 1083 (Hartz, J.,

concurring) ("The purported government interest is public safety.  But a number

of years of relevant data [regarding Oklahoma City] failed to support the claimed

danger.  I am not saying that such data are necessary to support a claim of danger.

. . . But when there are data available, *and they contradict what common sense*

81

*and expert opinion may tell us*, courts must be cautious before endorsing a governmental claim of danger." (emphasis added)).

Thus, for this reason, the City's reliance on *Evans* is misplaced and, more importantly, its reliance on scattered anecdotes in the record and its generic invocation of "common sense" are simply not enough to demonstrate that subsection (C)(2) is directed at remediating real harms in a manner that does not burden substantially more speech than necessary. *Cf. id.* at 1072–73 (conceding that "municipalities remain free to determine what type of evidence they will use to support proposed remedial regulations," and that "a government need not wait for accidents or fatalities to address its interest through safety regulations," but concluding that Oklahoma City's proffered evidence "d[id] not meet [its] burden," and admitting that we were "baffled as to why" there was not more objective evidence of pedestrian injuries if "medians present[ed] the danger that the [c]ity argue[d] they d[id]"); *Aptive*, 959 F.3d at 989, 993 (finding Castle Rock's "anecdotal and common-sense showing . . . woefully insufficient, when viewed through the 'helpful' prism" of cases in which "anecdotes, history, or common sense" had "previously been invoked," because, *inter alia*, the "common-sense and anecdotal evidence that" was presented was "*contradicted* by the police chief's testimony that there was no evidence that [the regulated conduct] posed a threat to public safety and the accompanying data demonstrat[ed] that there ha[d] not been any complaints about [such conduct

82

during the time period that was regulated]" (emphasis added) (quoting *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1235 n.12 (10th Cir. 2005)).

* * *

In sum, the City's largely evidence-free approach to establishing subsection (C)(2)'s constitutionality—an approach that is unavailing—is emblematic of its efforts, more broadly, to demonstrate the Ordinance's constitutionality—efforts that are *also* unavailing. With regard to subsection (B), the City all but admitted at oral argument that it lacks concrete evidence that such a sweeping prohibition on pedestrian presence near highway ramps is necessary to ameliorate, in a direct and material way, real, non-speculative safety concerns. *See* Oral Arg. at 2:43–3:01 (The court: "In the summary judgment record that was presented to the district judge and that's on review here, was there any evidence of any . . . accidents associated with an entrance or exit of a highway ramp?" City counsel: "Not any that involved pedestrians.").

And while the City strives to rely on accident reports to justify subsections (C) through (E), those reports actually *belie* any notion that these subsections alleviate a real, non-speculative government public-safety concern in a direct and material way. The City's attempt to bolster its showing by citing Ms. Loyoza's theoretical opinions, scattered and factually inapposite anecdotes, and its "common sense" are simply not enough to tighten the impermissibly "loose fit between [the City's chosen] means"—the Ordinance—"and [its] safety interest."

83

*McCraw*, 973 F.3d at 1077.  Thus, the City fails to carry its burden of showing that the Ordinance does not substantially burden more speech than necessary to advance its real, significant interests in pedestrian safety.

**3**

In addition to its evidentiary arguments discussed *supra*, the City also contends that the district court erred in "improperly concluding that the Ordinance"—and, in particular, subsections (C), (D), and (E)—"was not narrowly tailored due to the City's alleged failure to 'offer evidence that prove[d] "alternative measures that burden substantially less speech would fail to achieve the government's interests."'"  Aplt.'s Opening Br. at 44 (quoting *Martin*, F. Supp. 3d at 1035).  Under *Evans*, says the City, it was not required to prove the inadequacy of less-restrictive means *unless* the district court "first . . . determin[ed] that the [Ordinance] burdens substantially more speech than necessary."  *Id.*; *see also* Aplt.'s Reply Br. at 2–3 (arguing that the Plaintiffs' insistence on a "strict application of the less restrictive means inquiry" would "distort[] the deferential 'substantially broader than necessary' inquiry and . . . is contrary to . . . *Evans*").

Plaintiffs counter by citing *McCraw*, which we issued during the pendency of this appeal; under *McCraw*, argue Plaintiffs, the City is required to prove that less-restrictive means would fail to achieve its stated interests as effectively.  *See* Aplees.' Suppl. Br. at 2; *see also* Aplees.' Resp. Br. at 19 (arguing that, under our

84

pre-*McCraw* precedent—along with the Supreme Court's decision in *McCullen v. Coakley*—the City must demonstrate "why obvious, less-burdensome measures were insufficient to address its stated concerns" in order to establish narrow tailoring). *But cf.* Aplt.'s Suppl. Br. at 14–15 (maintaining that the less-restrictive-means inquiry does not arise until the court has made a predicate determination that the regulation is "substantially broader than necessary," and that *McCraw* did not change this, but nevertheless claiming that the City did, in fact, "introduce evidence of alternative measures it considered before enacting the Ordinance" that would satisfy any less-restrictive-means burden).

In framing their less-restrictive-means arguments in this manner, the parties broach a potential tension between our two most recent cases analyzing content-neutral time, place, and manner restrictions in public fora. As a general matter, "we must endeavor to interpret our cases in a manner that permits them to coexist harmoniously . . . with each other." *United States v. Hansen*, 929 F.3d 1238, 1254 (10th Cir. 2019) (collecting cases); *accord United States v. Miers-Garces*, 967 F.3d 1003, 1018 (10th Cir. 2020), *cert. denied*, 141 S. Ct. 1431 (2021). In undertaking this endeavor, we discover that what might, at first blush, appear to be a substantive tension between *Evans* and *McCraw* is, by and large, illusory, and—perhaps, more to the point—these two cases may "coexist harmoniously" without difficulty. *Hansen*, 929 F.3d at 1254. That is to say, when read alongside controlling Supreme Court authority and our prior precedents, *Evans*

85

and *McCraw* are best interpreted (as relevant here) as stating the following principle: in carrying its burden of proving that a content-neutral time, place, and manner regulation of speech or expressive conduct in a traditional public forum is narrowly tailored, the government will *ordinarily* need to show that it *seriously considered* alternative regulatory options that burden less protected speech or expressive conduct, yet also have the potential of achieving its real and significant interests.  Such a principle fits squarely with *McCraw*, among other cases, and, as we explain below, nothing in *Evans* is to the contrary.

We begin below by discussing our decisions in *Evans* and *McCraw*, along with other caselaw from the Supreme Court and this court.  Upon identifying the operative principles running through these cases, we apply those principles to the instant matter.  Here, Albuquerque has failed to establish that it *seriously considered* less-restrictive means to the Ordinance, which also have the potential of achieving its real and significant interests.  This failing by the City has the effect of underscoring and reinforcing our overarching conclusion: the City has not shown that the Ordinance is narrowly tailored to advance real, non-speculative interests.

**a**

**i**

**(A)**

In addressing the question of whether the government must consider less-

86

restrictive means as a facet of its narrow tailoring analysis, *Evans* and *McCraw* grapple with the implications of the Supreme Court's decision in *McCullen v. Coakley*, which in turn applied the Court's seminal First Amendment decision, *Ward v. Rock Against Racism*. Accordingly, we start our analysis with *Ward*, working our way forward in time to *McCraw*.

*Ward* dealt with a New York City regulation requiring performers in Central Park's Naumberg Acoustic Bandshell "to use sound-amplification equipment and a sound technician provided by the city." *Ward*, 491 U.S. at 784. The Court held that the regulation was a permissible, content-neutral time, place, and manner restriction and, more particularly, that the regulation was narrowly tailored to serving the city's significant interest in "ensuring the ability of its citizens to enjoy whatever benefits the city parks have to offer, from amplified music to silent meditation." *Id.* at 796–97. In reaching this narrow-tailoring conclusion, the Court disapproved of the appellate court's contrary analysis, which turned on New York City's failure to show that the sound-amplification regulation was the *least-restrictive* means to achieving the city's substantial interests. *Id.* at 797. In "sifting through all the available or imagined alternative means of regulating sound volume in order to determine whether the city's solution was 'the least intrusive means' of achieving the desired end," the appellate court erred, as the "less-restrictive-alternative analysis . . . has never been a part of the inquiry into the validity of a time, place, and manner

87

regulation." *Id.* (omission in original) (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 657 (1984) (opinion of White, J.)).

Rather, "restrictions on the time, place, or manner of protected speech are not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.'" *Id.* (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)).  Thus, the Court "reaffirm[ed] . . . that a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the *least* restrictive or *least* intrusive means of doing so." *Id.* at 798 (emphases added); *see id.* at 800 ("So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interests could be adequately served by some less-speech-restrictive alternative.").

Yet, twenty-five years later, the Court decided *McCullen v. Coakley*. *McCullen* invalidated a Massachusetts statute that enacted a "buffer zone" around certain medical facilities; specifically, the statute criminalized standing on a public way or sidewalk within thirty-five feet of any non-hospital facility that performed abortions.  *McCullen*, 573 U.S. at 469, 496–97.  The Court found that the statute "burden[ed] substantially more speech than necessary to achieve [Massachusetts's] asserted interests," and in making this finding, the Court discussed a number of alternative, regulatory options that could address the

88

state's significant interests while burdening substantially less speech in the process. *Id.* at 490–94. The state replied that it had tried alternative approaches, but that they had been ineffectual. *Id.* at 494. The Court was unmoved, observing that the state failed to identify "a single prosecution brought under th[ese alternative] laws within at least the last 17 years." *Id.*

Given this failure, the Court concluded the state "ha[d] not shown that it seriously undertook to address the problem[s it cited as justifying the buffer zone statute] with less intrusive tools readily available to it," nor had it "shown that it considered different methods that other jurisdictions ha[d] found effective." *Id.* Moreover, in response to Massachusetts's argument that enforcing the buffer zone law was easier than enforcing alternative measures, the Court opined that, "[t]o meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *Id.* at 495. Notably, in performing its analysis and reaching its holding, the Court did not shy away from *Ward*. Quite the contrary: *McCullen* liberally cited *Ward* throughout. *See, e.g.*, *id.* at 477–78, 486.

Against this backdrop we first decided *Evans v. Sandy City*. As noted *supra*, *Evans* affirmed that Sandy City's median ordinance was narrowly tailored to achieve the significant interest of public safety. *See Evans*, 944 F.3d at 851–52, 860. In reaching this conclusion, we rejected two arguments made by the

89

plaintiff. First, the plaintiff "contend[ed] [Sandy] City did not meet its burden to justify the fit between the ends [i.e., public safety] and the means [i.e., the ordinance] when it failed to 'compile any data, statistics, or accident reports'"; according to the plaintiff, "th[is was] the grit of *McCullen*: governments must provide real evidence to justify their public safety concerns." *Id.* at 857; *see id.* (the plaintiff claiming that Sandy City's "failure to conduct research and analysis [was] dispositive" as to the narrow tailoring question). We recognized that, in *McCullen*, the Supreme Court "explained [that] evidence of a problem at one abortion clinic at one time did not justify the burden [that Massachusetts's buffer zone statute placed] on other clinics at other times," but from this explanation we did not glean a "new evidentiary requirement for governments to compile data or statistics" in order to carry their narrow tailoring burden. *Id.* at 857–58. Instead, "governments bear the same burden" after *McCullen* as they did before, under *Ward*: i.e., they must "show a regulation does not 'burden substantially more speech than is necessary to further [their] legitimate interests.'" *Id.* at 858 (quoting *McCullen*, 573 U.S. at 486).

Second, and more relevant for our purposes here, the *Evans* plaintiff "argue[d] the [o]rdinance [was] not narrowly tailored because [Sandy] City did not demonstrate alternative measures that burden substantially less speech would fail to promote public safety." *Id.* at 858. More particularly—and crucially—the plaintiff argued as follows: "since the City did not '*prove* that it actually *tried*

90

other methods to address the problem,' . . . [the court] should strike down the [o]rdinance as not narrow tailored." *Id.* at 858–59 (quoting *Evans* Aplt.'s Opening Br. at 31, which in turn quotes *Reynolds v. Middleton*, 779 F.3d 222, 231 (4th Cir. 2015)). We rejected this argument, holding that, while *McCullen* "taught us [that] a less restrictive means analysis might be *helpful* in the narrow tailoring inquiry, . . . it did not modify *Ward*'s clear rule": i.e., that a time, place, and manner regulation must be "narrowly tailored to serve the government's legitimate, content-neutral interests," but that it "need not be the least restrictive or least intrusive means of doing so." *Id.* at 859 (emphasis added) (quoting *Ward*, 491 U.S. at 798). "So long as the means chosen are not substantially broader than necessary to achieve the government's interest," a regulation "will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 859 (emphasis omitted) (quoting *Ward*, 491 U.S. at 800).

Less than a year later, we decided *McCraw*, striking down Oklahoma City's median ordinance: we concluded that it was insufficiently tailored, and supported by only speculative interests. *See McCraw*, 973 F.3d at 1071–73, 1077–78. As *McCullen* did with *Ward*, we cited *Evans* liberally throughout our opinion. But we reached a slightly different resolution with the *McCraw* plaintiffs' less-restrictive-means argument than we did with the *Evans* plaintiff's argument. After concluding that Oklahoma City "ha[d] not met its burden to demonstrate

91

that its interest [was] based on a concrete, non-speculative harm" *and* that, instead, the city's ordinance actually "place[d] a severe burden on plaintiffs' speech," we also determined, "*[i]n light of the severity of [the ordinance's] burden*," that the city "ha[d] failed to demonstrate that less burdensome alternatives would not achieve its interest in median safety." *Id.* at 1073–74 (emphasis added). We noted that the *city* "acknowledge[d] in its brief" that, "under *McCullen*, '[it needed to] . . . demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier.'" *Id.* at 1074 (quoting *McCullen*, 573 U.S. at 495). Nonetheless, the city "assert[ed] that 'narrow tailoring d[id] not require [it] to undertake the futile task of identifying, reviewing[,] and rejecting alternatives that could not possibly protect pedestrians on medians from vehicles, or drivers of vehicles from distractions caused by pedestrians.'" *Id.* at 1075 (third and fourth alterations in original).

However, we determined that this argument of the city was implausible; indeed, the "only way for the [c]ity to evaluate alternatives," and subsequently opine on their utility, was "to *consider* them" in the first place—"precisely the burden articulated in *McCullen*." *Id.* And because the city "present[ed] no evidence that it contemplated the relative efficacy or burden on speech of any alternatives," we concluded the city "ha[d] not met [that] burden." *Id.*; *see also id.* at 1075–76 ("Given that the [c]ity ha[d] at its disposal information regarding

92

the relative safety of its medians at different times and in different locations, its failure to consider [less restrictive] alternatives *is especially harmful to its argument*. The data supports numerous alternatives to a total ban on presence on affected medians . . . ." (emphasis added)).

And we elaborated on our reasoning:

> [T]he [c]ity's summary dismissal of alternatives is insufficient. "[G]iven the vital First Amendment interests at stake, it is not enough for [the city] simply to say that other approaches have not worked." This is particularly so when there is no evidence that the [c]ity *has tried*, or *even considered*, any less-burdensome alternatives. Instead, the [c]ity relies on unsupported statements that hypothetically these alternatives *could not* possibly work. The [c]ity "has not shown that it seriously undertook to address the problem with less intrusive tools readily available to it[, n]or has it shown that it *considered* different methods that other jurisdictions have found effective."

*Id.* at 1076 (third, fourth, and eighth alterations in original) (first, second and fourth emphases added) (citations omitted) (quoting *McCullen*, 573 U.S. at 494, 496)).

## (B)

At the outset, it is important to highlight the arguments made and rejected in *Evans* and *McCraw*. As to *Evans*, we rejected the plaintiff's argument that, unless the government established that it had affirmatively *tried* to address the problems it identified as justifying a given regulation through less-burdensome means, it could *not* demonstrate that the regulation was narrowly tailored. *See Evans*, 944 F.3d at 858–59. In doing so, we recognized that, based on *McCullen*,

93

a "less restrictive means analysis might be *helpful* in the narrow tailoring inquiry," but that "*Ward*'s clear rule"—that the government's regulatory choice need not be the least restrictive or intrusive one—lives on and controls. *Id.* at 859 (emphasis added).

By contrast, in *McCraw*, the government effectively asserted that it need not "undertake the futile task" of *considering* less-restrictive means that would be ineffectual at addressing the government's significant interests. *McCraw*, 973 F.3d at 1075. This argument was a non-starter because the city "present[ed] . . . no evidence that it contemplated the relative efficacy or burden on speech of *any* alternatives." *Id.* (emphasis added). In other words, we stated that "the only way for [a c]ity to evaluate alternatives is to *consider* them"—and we went further and recognized that this need, relative to narrow tailoring, of a serious engagement with and consideration of less-restrictive means by the government was "precisely the [government] burden articulated in *McCullen*." *Id.*; *see also id.* at 1075–76.

Thus, the argument we rebuffed in *Evans* was an expansive one: i.e., that, in order to establish that a regulation is narrowly tailored, a city must affirmatively prove that it *tried* less-restrictive alternative measures *and* that those trials demonstrated that these measures were ineffectual in addressing the significant interests cited by the city. But in *McCraw*, we were not faced with such a proposed broad rule. There, Oklahoma City offered little more than general statements that less-restrictive means were unworkable—but these

94

statements were entirely unpersuasive given the lack of evidence that the city had even *considered*, let alone tried, such means.  And it was this baseline lack of *consideration* that we stressed was dispositive in *McCraw*.

Stepping back, and reading *Evans* and *McCraw* in the context of *Ward* and *McCullen*, we discern the following operative principles, which weave these cases into a cohesive and coherent whole.  Broadly speaking, it is clear from *McCullen*, *Evans*, and *McCraw* that *Ward*'s fundamental narrow-tailoring test is still controlling and provides the overarching foundation for our analysis.  Under this test, content-neutral restrictions on the time, place, or manner of speech in traditional public fora need not be the least restrictive means for achieving the government's significant interests.  *See, e.g.*, *McCraw*, 973 F.3d at 1073; *Evans*, 944 F.3d at 859; *see also iMatter Utah*, 774 F.3d at 1266; *Doe*, 667 F.3d at 1133.

However, in conducting this narrow-tailoring inquiry under *Ward* and its decisional progeny, a less-restrictive-means analysis is invariably helpful—and ordinarily necessary.  To be sure, *McCraw* arguably suggests that such an analysis is a required component of the government's narrow tailoring burden of proof. *See, e.g.*, *McCraw*, 973 F.3d at 1074, 1076 (in its narrow tailoring analysis, quoting *McCullen*'s language that "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests," and "conclud[ing] that the [c]ity's summary dismissal of alternatives is insufficient" (quoting *McCullen*, 573 U.S. at 495)).

95

But *Evans* does not go so far; it merely holds that such an analysis is helpful in a typical narrow-tailoring showing by the government. *Evans*, 944 F.3d at 859. We of course read these two cases—in the light of *Ward* and *McCullen*—with an eye towards harmonizing them. *See, e.g.*, *Hansen*, 929 F.3d at 1254. And, in doing so, it can be reasonably inferred from *Evans*'s acknowledgment of the helpfulness of a less-restrictive-means inquiry in the narrow tailoring analysis and from the importance that *McCraw* accords to this inquiry that the less-restrictive-means inquiry should almost always be a part of the government's narrow tailoring showing—even though it is not a standalone, required element of that showing. *Cf. Evans*, F.3d at 858 (noting that *McCullen* did not announce "new evidentiary requirement[s]"). And our examination *infra* of our precedent in analogous contexts and commercial speech precedent from the Supreme Court and this court only serves to validate the reasonableness of our inference.

### ii

Specifically, our conclusion is bolstered by our prior precedent, which highlights the significance of a less-restrictive-means inquiry within our narrow-tailoring analysis. Notably, our decision in *Verlo v. Martinez* reinforces the notion that the government's consideration of—or, more precisely, *failure to consider*—less restrictive means is relevant to the question of whether the chosen regulation is narrowly tailored to achieving the government's interests. In *Verlo*, we evaluated whether a federal district court erred in preliminarily enjoining an

96

order issued by a local judicial district prohibiting expressive activities in a courthouse plaza. *See Verlo*, 820 F.3d at 1118. We found no error in the federal district court's ruling. And, in doing so, we rejected the argument that the district court applied the wrong legal standard for assessing whether the judicial district's order—a content-neutral time, place, and manner restriction on speech in a public forum—was narrowly tailored. *See id.* at 1133–35. Specifically, as appellant, the local judicial district faulted the federal district court for "consider[ing] alternatives to the Order that might have been employed to achieve the . . . [d]istrict's objectives"; such consideration, said the local judicial district, "prove[d] [that] the district court [improperly] applied the 'least restrictive means' standard" to a content-neutral measure subject only to intermediate scrutiny. *Id.* at 1134. "In the Judicial District's view," then, "any inquiry into alternative means of achieving the government objective is inappropriate where, like here, the restrictions are content-neutral, rather than content-based, and thus not subject to the least restrictive alternative form of narrow tailoring." *Id.* at 1134–35.

"We disagree[d]." *Id.* at 1135. After setting out the overarching, narrow-tailoring standard—i.e., "the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation, and does not burden substantially more speech than is necessary to further the government's legitimate

97

interests"—we highlighted that the Supreme Court "has not discouraged courts from considering alternate approaches to achieving the government's goals when determining whether a content-neutral regulation is narrowly tailored to advance a significant government interest." *Id.* at 1134–35 (quoting *Wells v. City & Cnty. of Denver*, 257 F.3d 1132, 1148 (10th Cir. 2001)). Citing *McCullen*, we observed that, while the Court "has held that a content-neutral regulation 'need not be the least restrictive or least intrusive means of serving the government's interests,' it has also explained that 'the government still may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.'" *Id.* at 1135 (quoting *McCullen*, 573 U.S. at 486). Moreover, "when considering content-neutral regulations, the Court itself . . . examined possible alternative approaches to achieving the government's objective to determine whether the government's chosen approach burdens substantially more speech than necessary." *Id.*

Likewise, we recounted the Court's observation that the government "may not [simply] 'forgo[ ] options that could serve its interests just as well,' *if* those options would avoid 'substantially burdening the kind of speech in which [plaintiffs] wish to engage.'" *Id.* (second alteration in original) (emphasis added) (quoting *McCullen*, 573 U.S. at 490). Thus, "[t]o meet the requirement of narrow tailoring [in the context of content-neutral regulations], the government must demonstrate that alternative measures that burden substantially less speech would

98

fail to achieve the government's interests, not simply that the chosen route is easier." *Id.* (alterations in original) (quoting *McCullen*, 573 U.S. at 495). Consequently, in light of *McCullen*, we concluded in *Verlo* that the district court did not apply "the wrong legal standard merely because it considered whether the Judicial District had options other than the complete ban on speech [it chose] . . . that would equally serve its interests." *Id.*

Similarly, *iMatter Utah* provides support for the regular and ordinary incorporation of a less-restrictive-means analysis into the narrow-tailoring inquiry. There, we expressly quoted the language from *McCullen* that we also quote in *McCraw*: i.e., "[t]o meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests." *iMatter Utah*, 774 F.3d at 1266 (quoting *McCullen*, 573 U.S. at 495). We went on to fault the government for its failure to show that less-burdensome means would be ineffectual in achieving its stated interests. *See id.* at 1269 (stating that the government "must offer *some* evidence that [its chosen regulatory means], and not some less[ restrictive alternative], is necessary [to achieve its interests]"); *id.* at 1270–71 (acknowledging that one of the government's regulations is "narrower in scope" than another, but concluding that the regulation was, nevertheless, not narrowly tailored because the government "ha[d] offered no evidence that its existing . . . law [was] insufficient to [achieve its interests]").

99

Finally, in *Doe v. City of Albuquerque*, the city "did not present any evidence that its ban" on registered sex offenders in public libraries "was narrowly tailored to serve its interest in providing a safe environment for library patrons," instead simply citing and relying on other cases "in which courts have found challenged restrictions on sex offenders to be narrowly tailored." *Doe*, 667 F.3d at 1133–34. Stressing that the city had the burden to show the regulation was narrowly tailored, we noted that "whether the restrictions at issue in [other] cases were narrowly tailored in the respective contexts of those cases d[id] not compel any conclusion as to the [c]ity's ban" in *Doe*. *Id.* at 1134; *see id.* ("General reference to other cases involving other cities, other restrictions, other interests to be served, and other constitutional challenges do not relieve the [c]ity's burden in this case."). Moreover, the city "provided nothing in the record that could satisfy its obligation of proving that the ban is narrowly tailored." *Id.* And, most significantly, the city's failure to satisfy its burden of proof was brought into sharp relief, we reasoned, by the fact that "possible, less restrictive approaches . . . suggest[ed] themselves." *Id.* By invoking potential less restrictive means, at least tacitly, we suggested in *Doe* that we viewed a less-restrictive-means analysis ordinarily as being part and parcel of the broader, narrow-tailoring inquiry.

**iii**

Furthermore, commercial speech precedent from the Supreme Court and this court—which we have recognized is closely analogous to time, place, and manner caselaw—confirms the salience of a less-restrictive-means analysis to the overarching narrow tailoring inquiry. *See Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989) (recognizing that the test governing the validity of restrictions on commercial speech is "'substantially similar' to the application of the test for validity of time, place, and manner restrictions on protected speech" (quoting *S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 537 n.16 (1987)); *see also supra* note 14. For example, in *U.S. West, Inc. v. FCC*, we made the following remarks regarding narrow tailoring in the context of a commercial speech regulation:

> Even assuming, arguendo, that the state interests in privacy and competition are substantial and that the regulations directly and materially advance those interests, we do not find, on this record, the FCC rules regarding customer approval properly tailored. The . . . regulations must be "no more extensive than necessary to serve [the stated] interest[s]." In order for a regulation to satisfy this final . . . prong [of the commercial speech framework], there must be a fit between the legislature's means and its desired objective—"a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." While clearly the government need not employ the least restrictive means to accomplish its goal, it must utilize a means that is "narrowly tailored" to its desired objective. Narrow tailoring means that the government's speech restriction must signify a "carefu[l] calculat[ion of] the costs and benefits associated with the burden on speech imposed by its prohibition." "*The availability of less burdensome alternatives to reach the stated goal signals that the fit between the legislature's ends and*

*the means chosen to accomplish those ends may be too imprecise to withstand First Amendment scrutiny."   This is particularly true when such alternatives are obvious and restrict substantially less speech.*

182 F.3d 1224, 1238 (10th Cir. 1999) (third alteration added) (emphasis added) (citations omitted) (first quoting *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 486 (1995); then quoting *Fox*, 492 U.S. at 480; then quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 (1993); and then quoting *44 Liquormart*, 517 U.S. at 529 (O'Connor, J., concurring)), *cert. denied*, 530 U.S. 1213 (2000).

We went on to note, in footnote 11 of that opinion, that, while the passage quoted above "in effect[] imposes a burden on the government to *consider* certain less restrictive means—those that are obvious and restrict substantially less speech—it does not amount to a least restrictive means test." *Id.* at 1238 n.11 (emphasis added).  That is, "[w]e do not require the government to consider every conceivable means that may restrict less speech and strike down regulations when *any* less restrictive means would sufficiently serve the state interest." *Id.*  Rather, "[w]e merely recognize[d] the reality that the existence of an obvious and substantially less restrictive means for advancing the desired government objective indicates a lack of narrow tailoring."[17]  *Id.*

---

[17]    Additional cases accord with *West* in acknowledging the significance of a meaningful consideration by the government of less restrictive means to the narrow tailoring inquiry.  *See, e.g.*, *Discovery Network, Inc.*, 507 U.S. at 417 n.13
(continued...)

* * *

These cases, read together, then, make clear that a less-restrictive-means

analysis is ordinarily part and parcel of the narrow tailoring inquiry itself. And,

as we have stated above, we think that the government, which bears the burden of

establishing that its time, place, and manner regulations are narrowly tailored to

achieving its significant interests, should *ordinarily* undertake a less-restrictive-

means analysis as a facet of this narrow tailoring showing.

---

[17](...continued)
("We reject the city's argument that the lower courts' and our consideration of alternative, less drastic measures by which the city could effectuate its interests . . . somehow violates [our prior] holding that regulations on commercial speech are not subject to 'least-restrictive-means' analysis. To repeat, while we have rejected the 'least-restrictive-means' test for judging restrictions on commercial speech, so too have we rejected mere rational-basis review. A regulation need not be 'absolutely the least severe that will achieve the desired end,' but if there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable." (citations omitted) (quoting *Fox*, 492 U.S. at 480)); *Rubin*, 514 U.S. at 491 (suggesting that "the availability of alternatives that would prove less intrusive to the First Amendment's protections for commercial speech" and "could [still] advance the Government's asserted interest" indicates that a particular regulation "is more extensive than necessary"); *Mainstream Mktg. Servs., Inc. v. F.T.C.*, 358 F.3d 1228, 1242 (10th Cir. 2004) ("Whether or not there are 'numerous and obvious less-burdensome alternatives' is a relevant consideration in our narrow tailoring analysis." (quoting *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 632 (1995))); *cf. Thompson*, 535 U.S. at 371–73 (stating that the Court "ha[s] made clear [in prior commercial speech cases] that if the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech, the Government must do so," then proceeding to consider alternative approaches that would restrict less speech, and concluding the government had failed to carry its burden by "not offer[ing] any reason why these [alternatives], alone or in combination, would be insufficient to [advance its interests]"—or indicating in the record that it had even considered the relative efficacy of any of these alternatives).

**b**

As for what this analysis should look like in practice, our decision in *Evans*
bars making actual testing of less-restrictive means dispositive to our narrow-
tailoring assessment; in other words, it effectively concluded that it was improper
to impose a new, evidentiary burden on the government to affirmatively
demonstrate that it *tried* alternative, less-restrictive approaches before enacting a
particular regulation.  *See Evans*, 944 F.3d at 858–59 (rebuffing the argument that
the government must prove it tried less-restrictive means in order to establish
narrow tailoring); *cf. McCraw*, 973 F.3d at 1076–78 (citing the Fourth Circuit's
*Reynolds* decision, which articulates this burden on the government to prove that
it tried less-restrictive means, but ultimately resting its holding as to narrow
tailoring in part on the city's failure to demonstrate that it *considered* less-
restrictive means).  Nothing in *Evans*, however, prevents us from inquiring into
whether the government tried or tested less-restrictive means as part of our
overarching narrow tailoring assessment, even if such testing is not a requirement.

More significantly, we do think *McCraw* (along with other cases discussed
*supra*) makes clear that the government's less-restrictive-means analysis *must*
involve at least a *serious consideration* of less-restrictive means.  That is, the
government may not simply wave at such an analysis superficially.  Instead, in
weighing whether to enact a particular regulation that burdens protected speech,
the government should seriously consider the relative efficacy of means

104

that impose lesser burdens on speech, while having the potential of achieving its real and significant interests.

This principle is a direct fit with *McCraw*'s holding, and it comports as well with the Supreme Court's analysis in *McCullen*. Nor is such a principle at odds with our decision in *Evans*, as we had no occasion to opine in that case on whether serious consideration of means ordinarily should be part and parcel of any less-restrictive-means analysis, given the expansive argument that was made by the *Evans* plaintiff. Indeed, far from being at odds with *Evans*, this principle is arguably implicit in it. That is, we expressly recognized that a less-restrictive-means analysis is helpful to the narrow tailoring inquiry—and if such an analysis is helpful, we should expect the government to do more than gesture at it, or ignore it altogether. Rather, if the government undertakes such an analysis, it should do so seriously.

In sum, we believe that *Evans* and *McCraw*, along with numerous other cases that we have discussed *supra*, stand for the principle that a less-restrictive-means analysis is *ordinarily* a necessary part of a government's narrow tailoring showing. Moreover, while such a less-restrictive-means analysis need not entail the government affirmatively proving that it *tried* less-restrictive means that have the potential of achieving its real and significant interests, it *does* entail the government giving *serious consideration* to such less-restrictive means before opting for a particular regulation. With these principles in place, we assess

105

whether the City's less-restrictive-means analysis is sufficient here to demonstrate that the Ordinance is narrowly tailored.  We conclude that it is not.

**4**

The City's less-restrictive-means analysis is insufficient to demonstrate that the Ordinance is narrowly tailored, and this insufficiency bolsters our conclusions, outlined *supra*, that the Ordinance is not meaningfully directed at alleviating non-speculative harms, and burdens substantially more speech than necessary to achieve the City's aims.  To start, the City argues that it need not "show that it considered . . . less burdensome alternatives" because the Ordinance "[is] not substantially broader than necessary to achieve the City's interest." Aplt.'s Suppl. Br. at 14.  But as our precedents suggest—along with the foregoing analysis in this opinion—we typically cannot reach an informed conclusion regarding whether an ordinance is substantially broader than necessary *without* an inquiry into less-burdensome alternatives.  Consequently, a bald assertion by the government that an ordinance is not substantially broader than necessary will not ordinarily be sufficient to satisfy the narrow-tailoring inquiry or render unnecessary an inquiry into less-burdensome alternatives.  And, as shown *supra*, the City's not-substantially-broader-than-necessary assertion does not have sufficient grounding in the record evidence to be labeled anything other than "bald."

Alternatively, the City insists that it *did* undertake a less-restrictive-means analysis, and that such analysis revealed the Ordinance to be "the most appropriate way to address its interest in preventing pedestrian-vehicle conflicts." *Id.* at 14–15; *see also* Aplt.'s Reply Br. at 12–13, 17–19, 23–24 (asserting, in relatively conclusory fashion, that the alternatives proffered by Plaintiffs and the district court would not be equally as effective at promoting pedestrian safety as the Ordinance). The record does not support the City's position. To be sure, the City is correct that it was not required to show that it actually *tried* less-restrictive means. But as explained *supra*, the City *was* obligated to show that it *seriously considered* less-restrictive means. The City's purported analysis, as outlined in its briefing, however, does not evince such serious consideration.

Specifically, the City attempts to show consideration of alternative approaches by noting that it "considered ordinances prohibiting pedestrians and vehicles from obstructing streets and prohibiting jaywalking," but that "those ordinances d[id] not address the dangers the City identified." Aplt.'s Suppl. Br. at 14. As well, the City claims it "considered certain state statutes, but th[ese statutes] similarly d[id] not regulate conduct on medians or pedestrian-vehicle conflicts." *Id.* But these references to facially-inapposite ordinances and statutes do not demonstrate that the City seriously undertook a less-restrictive-means analysis. These laws are not a close fit with the problems and interests the City identifies as justifying the Ordinance. Identifying laws clearly not directed at

107

these problems and simply declaring them to be ineffectual does not provide a proper predicate for imposing the Ordinance and does not satisfy the City's narrow-tailoring burden, as such an approach gives us little insight into whether the Ordinance is, in fact, substantially broader than necessary. *See* Aplt.'s App., Vol. II, at 426–34 (Mr. Melendrez likening his review of other ordinances or laws to "checking a box" and testifying that he felt other regulatory options would not address the City's interests because of, *inter alia*, difficulties with enforcement); *cf. McCullen*, 573 U.S. at 494–97 (rejecting the state's argument that alternative approaches were ineffectual because they would be harder to enforce than the more burdensome regulation chosen because "the prime objective of the First Amendment is not efficiency," and concluding that the state could not, "consistent with the First Amendment," "close[] a substantial portion of a traditional public forum to all speakers" without "seriously addressing [its identified] problem through alternatives that leave the forum open for its time-honored purposes").

The City also claims that it "considered limiting the Ordinance only to certain intersections, but found that it could not distinguish those intersections from similar dangerous roadway locations throughout the City." Aplt.'s Suppl. Br. at 14–15. Here, though, the record indicates that any consideration of a narrower Ordinance was cursory at best. *See* Aplt.'s App., Vol. IV, at 1115 (Counsel: "At any point did the City consider limiting the ordinance only to intersections that were determined to be particularly dangerous?" Mr. Melendrez:

"Briefly, at best").  Likewise, the City's attempt to show that less-restrictive means proposed by Plaintiffs would be ineffectual is far too underdeveloped to advance the City's cause.  *See* Aplt.'s Suppl. Br. at 15 n.3 (claiming that the City "addressed . . . Plaintiffs' comments concerning potential less restrictive means in its Reply Brief," but citing portions of its Reply Brief that contain, at best, a superficial engagement with the efficacy of these potential less-restrictive alternatives); *cf.* Aplees.' Resp. Br. at 37–39, 41–42 (proposing alternative measures to the Ordinance that arguably would burden less speech while addressing as effectively the City's stated interests); Aplees.' Suppl. Br. at 13–14 (same).

In any event, given that the City did not meaningfully engage in a less-restrictive-means analysis here, we need not speculate as to whether Plaintiffs' proposed less-restrictive means would address the City's interests as efficaciously as the Ordinance.  After all, the narrow tailoring burden is on the City—not Plaintiffs.  Thus, even if Plaintiffs' proposals turned out to be less efficacious, the City would still fail to demonstrate that the Ordinance is narrowly tailored for the reasons already discussed.  *Cf. Doe*, 667 F.3d at 1134 (noting that "[o]ther possible, less restrictive approaches [than the ban chosen by the government] potentially suggest themselves," but declining to engage in "speculation upon speculation" given that the city "provided nothing in the record that could satisfy its obligation of proving that the ban is narrowly tailored").  Thus, the City's

deficient, largely non-existent less-restrictive-means analysis bespeaks and emphasizes what we have already concluded: the Ordinance is not narrowly tailored to serve the City's significant and non-speculative interests.

**IV**

For the reasons stated *supra*, we conclude that Albuquerque's Ordinance is not narrowly tailored to serve its identified significant governmental interests. In light of this conclusion, we need not consider whether the Ordinance leaves open ample alternative channels of communication. *See McCullen*, 667 F.3d at 496 n.9. Accordingly, we **AFFIRM** the district court's judgment.[18]

---

[18] As noted *supra*, the parties do not appeal the district court's ruling regarding the validity of subsection (A) of the Ordinance. *See supra* note 2. Neither do the parties appeal the district court's conclusions regarding severability of the Ordinance's subsections. *See Martin*, 396 F. Supp. 3d at 1023 n.10 (concluding that the Ordinance's severability clause is valid and that subsection (A) of the Ordinance can be severed from any remaining, invalid portions). Thus, in affirming the district court's judgment as to the invalidity of subsections (B), (C), (D), and (E) of the Ordinance, we make no ruling concerning the other subsections of the Ordinance.